Charles D. MOREAU et al.

v.

Robert G. FLANDERS, Jr., Esq., in his capacity as appointed Receiver for the City of Central Falls et al.

No. 2010–400–Appeal.

Supreme Court of Rhode Island.

March 29, 2011.

Michael A. Kelly, Esq., Providence, for Plaintiff.

Theodore Orson, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

### Background: A City in Distress

We are called upon to determine the constitutionality of G.L.1956 chapter 9 of title 45, in the face of a challenge by the Mayor and City Council of the City of Central Falls. Before we begin our analysis, we find it appropriate to pause and compliment the detailed, well-written, and scholarly decision of the trial justice, whose judgment we affirm completely and with confidence.

The City of Central Falls long has enjoyed the reputation of being one of America's most densely populated cities. Packed within 1.2 square miles live 19,000 people. The General Assembly created the city in 1895, partitioning it from the neighboring Town of Lincoln. Over the years, Central Falls became a bustling industrial center and the home to a variety of proud immigrant and ethnic groups. Over time, however, the city experienced financial distress, and by 1991, it no longer had the financial resources to operate its schools, resulting in a takeover by the state. In more recent years, Central Falls, like other communities, has continued to struggle financially. With the closure of several manufacturing facilities, the city's tax base dwindled, causing its fiscal woes to become exacerbated. With its largest taxpayers gone, no land to develop, and confronted with the crushing realities of a devastating local and national economy, there is no surprise that the city's leaders felt that their backs were up against the wall. And thus, believing there was no other viable solution to the city's dire financial plight, the mayor and city council in May 2010, petitioned the Superior Court for the appointment of a receiver, a petition that was granted by the court.

At the same time, however, legislation that would enact a major revision to chapter 9 of title 45 was working its way through the General Assembly. Signed into law in June that same year, the legislation prohibited municipalities from seeking the appointment of judicial receivers, but instead authorized the director of the Department of Revenue to implement a defined process to restore stability to a fiscally imperiled city or town. That process involved a tiered system of oversight, including appointments of a fiscal overseer, a budget and review commission, and finally a nonjudicial receiver.

On July 16, 2010, retired Superior Court Justice Mark A. Pfeiffer (Pfeiffer or receiver) was appointed by the director of the Department of Revenue to serve as receiver for the City of Central Falls under the terms of chapter 9 of title 45, as amended by P.L.2010, ch. 27, § 1, entitled, "An Act Relating to Cities and Towns—Providing Financial Stability" (act or Financial Stability Act).[1] The City of Central Falls is a duly authorized municipal corporation that has a home-rule charter adopted in accordance with article 13 of the Rhode Island Constitution.[2] The city's

1. Shortly prior to oral argument, the Governor, through the director of the Department of Revenue, appointed Robert G. Flanders, Jr., Esq., to succeed Pfeiffer as receiver.

2. See Viveiros v. Town of Middletown, 973

form of government includes a mayor, who serves as chief executive officer, and a five-member city council. Both the mayor and the city council are elected by the city's residents. At all times relevant to this cause of action, Charles D. Moreau (Moreau or mayor) has been the mayor. Similarly, at all times relevant to this matter, William Benson, Jr. (Benson or council president), Richard Aubin, Jr., Eunice DeLaHoz, Patrick J. Szlastha, and James Diossa [3] (collectively, city council) have been the members of the city council.

## Facts and Travel

In an effort to stem the effects of its financial distress, the city council, by resolution, and the mayor authorized the filing of a verified petition for appointment of a receiver with the Providence County Superior Court on May 18, 2010. The circumstances preceding this verified petition, which named the City of Central Falls as defendant, included a June 30, 2009, independent audit, which revealed: (1) that the city had total net assets of negative $16,866,819; (2) an annual operating budget for 2010 and a proposed operating budget for 2011 just under $18 million, with anticipated shortfalls of $3 million for 2010 and $5 million for 2011; (3) municipal bond indebtedness of over $10 million; (4) the city's sale of much of its chief pension fund to satisfy current pension obligations; (5) accrued pension fund liability exceeding $35 million, supported by assets of only $4 million; (6) the city's failure to make any contributions to the pension fund in 2009, despite a requirement that it make a contribution in excess of $2.7 million for that year; (7) the fact that increasing the prop-

erty tax rate by the maximum allowed under the state cap of 4.5 percent would yield additional revenues of less than $500,000; and (8) a request by Central Falls to the General Assembly to grant it the authority to file for Chapter 9 bankruptcy pursuant to Title 11 of the United States Code, providing for the adjustment of debts of a municipality.

In their verified petition to the Superior Court seeking the appointment of a judicial receiver, the mayor and the city council represented:

> "Plaintiffs have determined that the City is fiscally insolvent due to revenue shortfalls and state budget cuts, along with collective bargaining agreements and pension obligations it cannot afford.
>
> " * * *
>
> "In the opinion of Plaintiffs, the elected leaders of the City, it is urgent and advisable that a Receiver be appointed immediately to oversee the affairs of the City to assist in balancing the City's budget through spending cuts and revenue enhancement * * *."

After a hearing on the petition, the Superior Court, on May 19, 2010, entered an order appointing attorney Jonathan Savage as temporary receiver for the City of Central Falls; a permanent receiver was to be appointed "on or before June 8, 2010." In its order, "the [c]ourt determined that [appointment of a receiver] would be in the best interest of the Defendant's taxpayers, employees, creditors, vendors, and pensioners and other interested parties * * *." The order further delineated the terms and conditions of the

---

A.2d 607, 611 n. 3 (R.I.2009) (observing that no substantive changes were made when the state constitutional convention of 1986 relocated the home-rule amendment from article 28 to article 13 of the Rhode Island Constitution).

**3.** We note that Councilman Diossa did not join with the other members of the city council and Mayor Moreau in this action.

temporary receivership as well as the powers conferred on the receiver.

As a result of the petition for judicial receivership, the already precarious credit rating of Central Falls was reduced to "junk-bond" status. Even more ominously, state officials were informed by financial rating agencies that, as a result of Central Falls' receivership, capital markets would view debt financing to Rhode Island cities and towns as extremely risky, and that as a consequence such financing would become more expensive for Rhode Island municipalities. Faced with that scenario, the General Assembly determined that judicial receiverships, initiated solely at the discretion of a municipality, were not in the best interest of the citizens of Central Falls or the state, and that municipally initiated judicial receiverships threatened the financial well-being of all the state's cities and towns, and of the state itself. The General Assembly moved with alacrity, revising chapter 9 of title 45 (Budget Commissions) for the purpose of creating a more effective mechanism to identify and respond to dire financial adversity confronting municipalities. On June 11, 2010, a major revision was signed into law. Significantly, § 45-9-1, as amended by P.L.2010, ch. 27, § 1, set forth:

> **Declaration of policy and legal standard.** It shall be the policy of the state to provide a mechanism for the state to work with cities and towns undergoing financial distress that threatens the fiscal well-being, public safety and welfare of such cities and towns, or other cities and towns or the state, with the state providing varying levels of support and control depending on the circumstances. The powers delegated by the General Assembly in this chapter shall be carried out having due regard for the needs of the citizens of the state and of the city or town, and in such a manner as will best preserve the safety and welfare of citizens of the state and their property, and the access of the state and its municipalities to capital markets, all to the public benefit and good."

Of great significance, this revision foreclosed the right of municipalities to petition the courts for the appointment of a judicial receivership, as had been done by Central Falls.[4] This was of particular relevance to Central Falls because § 4 of the act (P.L. 2010, ch. 27) made the revision retroactive to May 15, 2010—four days before the order of the Superior Court that granted the mayor and city council's request for a judicial receiver.

However, any potential conflict that may have arisen because of the passage of the new act and the duties of the judicially appointed receiver was avoided when Mayor Moreau and the city council jointly sought a consent order, by a city council resolution approved June 17, 2010, requesting the dismissal of "the pending Superior Court action with prejudice after transitioning the Receivership from Superior Court to the State Department of Revenue." The council's resolution declared that city leaders were forced to seek a receiver "due to fiscal insolvency as a result of revenue shortfalls, state budget cuts, along with collective bargaining agreements and pension obligations it cannot afford * * *." Shortly thereafter, the Superior Court entered the consent order, signed by counsel for the mayor and city council, permitting withdrawal of the petition for judicial receivership with prejudice and outlining a transition period to move

---

4. General Laws 1956 § 45-9-13 provides that, "[n]o city or town shall be placed into, or made subject to, either voluntarily, or involuntarily, a judicial receivership proceeding."

Central Falls into state receivership "[p]ursuant to the terms of the Act Relating to Cities and Towns—Providing Financial Stability."

In a letter on July 16, 2010, the director of the Department of Revenue appointed Pfeiffer as receiver for the city. In turn, by letter dated July 19, 2010, Pfeiffer informed Mayor Moreau that he had been appointed receiver of Central Falls and that he had assumed the duties and functions of the office of mayor. The receiver wrote:

"R.I. Gen. Laws § 45–9–7 provides the receiver with 'the right to exercise the powers of the elected officials' of a municipality and that the 'powers of the receiver shall be superior to and supersede the powers of the elected officials'. That statute further provides that the elected officials of the city or town 'shall serve in an advisory capacity to the receiver'.

"Effective immediately, I have assumed the duties and functions of the Office of Mayor. As a result of my role, your responsibility will be limited to serving in an advisory capacity, on such occasions as my office may seek input from you. Accordingly, pursuant to R.I. Gen. Laws § 45–9–6(d)(g) your compensation will be reduced to $1,000.00 bi-weekly effective today." [5]

Mayor Moreau was not afforded an opportunity to be heard regarding the imposed changes.

In a resolution passed on August 4, 2010, the city council authorized the hiring of independent legal counsel "for guidance and/or litigation concerning the numerous matters that currently affect the City, the Central Falls Community as a whole and the discharge of [the] City Council's obligations * * *." The very next day, citing relevant provisions of the act, the receiver informed the city council by letter of his decision to rescind the resolution. Specifically, the receiver cited §§ 45–9–7(b)(1) and 45–9–6(d)(17). Section 45–9–6(d)(17) grants the receiver the power to "[a]lter or rescind any action or decision of any municipal officer, employee, board, authority or commission within fourteen (14) days after receipt of notice of such action or decision." The receiver's letter concluded, "I will review the organization of the Office of Solicitor to [e]nsure that the Council receives legal advi[c]e it may require from time to time to perform its duties."

Obviously unhappy with that turn of events, on September 20, 2010, the city council passed a four-page resolution entitled, "In Support of the Mayor and the City Council contend [*sic*] it is necessary to determine the constitutionality of R.I. General Laws 45–9–3, 45–9–5, 45–9–6 and 45–9–7." That resolution authorized the engagement of independent legal counsel to file a legal action to challenge the constitutionality of the act. However, on September 22, 2010, the receiver, by letter to the council president, rescinded the resolution of September 20, 2010 as well. That letter said that "with respect to the issue of whether the Act or any sections thereunder should be subject to constitutional challenge, under R.I. Gen. Laws Section 45–9–7(c), the City Council is hereby directed to serve solely in an 'advisory' capacity." [6]

---

**5.** We are certain that the receiver intended to cite to § 45–9–6(d)**(9)**, which endows the receiver with the power to "[a]lter or eliminate the compensation and/or benefits of elected officials of the city or town to reflect the fiscal emergency and changes in the responsibilities of the officials as provided by this chapter"; we observe that there is no § 45–9–6(d)**(g)**. (Emphases added.)

**6.** Although that letter restricted the city council to an advisory capacity solely with regard

On September 23, 2010, the receiver filed a verified complaint with the Superior Court, seeking a declaratory judgment and injunctive relief against Mayor Moreau and City Council President, William Benson, Jr. Undeterred, on September 27, 2010, the council, citing its September 20 resolution, filed its own multi-count cause of action in Superior Court. Its complaint named the director of the Department of Revenue and the state-appointed receiver as defendants. The two actions were consolidated, and the case was tried on an agreed statement of facts in the Superior Court. In a comprehensive opinion dated October 18, 2010, the trial justice addressed sundry arguments pertaining to the constitutionality of the Financial Stability Act itself, including the act's potential incompatibility with the home-rule amendment of the Rhode Island Constitution. In his cogent decision, the trial justice ruled:

> "[T]he Court finds that the Act is constitutional * * *. [T]he Court holds that the Act applies alike to all cities and town[s], addresses a statewide concern, does not alter a municipality's form of government, and is substantially related to the public welfare. Furthermore, the Court holds that the 'Declaration of Policy and Legal Standard' and the five-tiered mechanism delineated within the Act provide sufficient standards, principles, and safeguards by which to guide the administration of the Act and prevent against arbitrary and capricious actions. Additionally, the Court holds that neither the Mayor nor the City Council has been removed from office and that they have failed to establish a claim for procedural due process."

Judgment was entered on October 21, 2010.[7]

The mayor and city council timely appealed the judgment of the Superior Court. The matter was assigned to the regular calendar for a full briefing and hearing, and the parties appeared before this Court on February 1, 2011.

## Standard of Review

In reviewing the constitutionality of statutes, "we begin with the principle that legislative enactments of the General Assembly are presumed to be valid and constitutional." *Newport Court Club Associates v. Town Council of Middletown*, 800 A.2d 405, 409 (R.I.2002) (quoting *Rhode Island Depositors Economic Protection Corp. v. Brown*, 659 A.2d 95, 100 (R.I.1995)). This Court approaches constitutional questions with great deliberation, caution, and even reluctance, and we do not declare a statute void unless we find it to be constitutionally defective beyond a reasonable doubt. *Gorham v. Robinson*,

to the subject of constitutional questions and challenges to the act, relegation of the city council to an advisory capacity in all matters would not be long in coming.

7. On November 8, 2010, the receiver sent a letter to four members of the city council, informing the members of his decision to cancel a city council meeting scheduled for that very evening. In addition, responding in part to having been informed that the city council had rejected a policy statement that he had promulgated, the receiver wrote:

> "I am disappointed by the City Council's decision not to cooperate and work closely with our efforts to return fiscal stability to the City of Central Falls and to advance the interests of its businesses and residents. As the City Council is unwilling to cooperate in these efforts, I have no choice but to immediately exercise my power under the *Act Relating to the Cities and Towns—Providing Financial Stability*, Rhode Island General Laws § 45-9-7(c), to relegate the City Council and its members to an advisory capacity. I will let you know if and when the advice of the City Council and/or its members is needed."

57 R.I. 1, 7, 186 A. 832, 837 (1936). Moreover, we will attach to the enactment every reasonable intendment in favor of constitutionality. *Gem Plumbing & Heating Co. v. Rossi,* 867 A.2d 796, 808 (R.I.2005) (quoting *Lynch v. King,* 120 R.I. 868, 875, 391 A.2d 117, 121 (1978)); *City of Pawtucket v. Sundlun,* 662 A.2d 40, 45 (R.I. 1995).

■ Further, it is well settled that "the party challenging the constitutional validity of an act carries the burden of persuading the court that the act violates an identifiable aspect of the Rhode Island or United States Constitution." *Newport Court Club Associates,* 800 A.2d at 409 (quoting *Brown,* 659 A.2d at 100). "Unless the party challenging the statute's constitutionality can 'prove beyond a reasonable doubt that the act violates a specific provision of the [state] constitution or the United States Constitution, this Court will not hold the act unconstitutional.'" *Mackie v. State,* 936 A.2d 588, 595 (R.I.2007) (quoting *Cherenzia v. Lynch,* 847 A.2d 818, 822 (R.I.2004)).

### Analysis

■ As a preliminary matter, we address the contention of the receiver that the mayor and city council lack the standing necessary to challenge the constitutionality of the act. Our standard for establishing standing requires that a plaintiff alleges that the challenged act or action "has caused him or her injury in fact, economic or otherwise." *Pontbriand v. Sundlun,* 699 A.2d 856, 862 (R.I.1997) (quoting *Rhode Island Ophthalmological Society v. Cannon,* 113 R.I. 16, 22, 317 A.2d 124, 128 (1974)). Such an injury must be "concrete and particularized," and "actual or imminent," and not merely "conjectural or hypothetical." *Id.* at 862 (quoting *Lujan v. Defenders of Wildlife,* 504

U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

■ Here, we have little difficulty in concluding that the mayor and city council, in their individual and official capacities, have standing to challenge the constitutionality of the act. They allege, and the receiver admits, that their duties and authority have been curtailed based on the powers provided to the state-appointed receiver under the act. There is no question that the decision-making authority of the mayor and city council have been restricted profoundly by the application of various provisions of the act. Moreover, reputations of persons who hold such high-profile public positions certainly suffer adverse impacts. Having determined that the mayor and city council have standing, we now address the merits of the various arguments raised.

### I

### The Act Does Not Alter the Form of Government of Central Falls in Contravention of the Home–Rule Amendment of the Rhode Island Constitution

The appellants, the mayor and city council, contend that the act treads upon the city's right to self-governance as guaranteed by article 13 of Rhode Island's Constitution. Section 1 of article 13, generally referred to as the home-rule charter amendment, provides that "[i]t is the intention of this article to grant and confirm to the people of every city and town in this state the right to self government in all local matters." Specifically, the mayor and city council argue that the act offends article 13, section 4, which says in pertinent part:

"The general assembly shall have the power to act in relation to the property, affairs and government of any city or

town by general laws which shall apply alike to all cities and towns, *but which shall not affect the form of government of any city or town.*" (Emphasis added.)

In their brief, the mayor and city council argue that, in a manner "completely counter to the democratic principle of checks and balances," the broad powers vested in the receiver pursuant to the act impermissibly "affect the form of government" of Central Falls.

■ In considering the positions of the parties on this issue, we do not write on a blank slate. In *Marran v. Baird,* 635 A.2d 1174, 1176 (R.I.1994),[8] this Court addressed a constitutional challenge to the predecessor version of chapter 9 of title 45, entitled "Budget Commissions," under which the director of the State Department of Administration was empowered to appoint a nine-member commission to examine and advise the Town of West Warwick after that town's municipal bonds had been downgraded to "junk-bond" status by a bond rating agency. In *Marran,* the plaintiff sought to enjoin the activities of the commission, alleging that the activities of that body collided with the right of the town to self-governance under the home-rule amendment and was, in addition, an unlawful delegation of legislative power to the commission. *Marran,* 635 A.2d at 1176–77. In that case, the Court wrote:

"Article 13, sections 1 and 2, of the Rhode Island Constitution grants the right of self-government in all local matters to the people of every city or town that has adopted a charter consistent with the Rhode Island Constitution and laws enacted by the General Assembly. *In re Advisory Opinion to the House of Representatives,* 628 A.2d 537, 538 (R.I. 1993). * * * [H]owever, 'the power to act in relation to the property, affairs and government of any city or town by general laws which shall apply alike to all cities and towns, but which shall not affect the form of government of any city or town.' R.I. Const. art. 13, sec. 4. If the General Assembly does act in relation to a particular city or town, such legislative action must be submitted to the electors of the town." *Marran,* 635 A.2d at 1177.

The Court then made the important observation that, in relation to the home-rule charter amendment, the constitutional validity of an enactment by the General Assembly under its reserve power "hinges upon resolution of two issues: (1) whether [the enactment] 'applies alike' to all municipalities and (2) whether it affects any municipality's form of government." *Id.* at 1178.

## A

### Whether the Act Applies Alike to All Cities and Towns

As to the first issue, we held in *Marran* that § 45–9–3 was constitutional because the provision "empower[ed] the director to appoint a budget and review commission 'in any town or city.'" *Marran,* 635 A.2d at 1177. By its own terms the provision did not apply to any specific town or city, and so it was clearly an enactment of general application. The Court contrasted *Marran* with *McCarthy v. Johnson,* 574 A.2d 1229, 1231 (R.I.1990), where, because the challenged enactment expressly and solely authorized a suit against the City of Newport, it did not apply alike to all cities and

---

8. We do not agree with the contention of the mayor and city council that the significant revisions to the act have rendered the holding in *Marran* inapplicable. Rather, we deem the analytic framework used in *Marran* to be intact and wholly portable to the matters before us.

towns, was merely a matter of local concern, and therefore, was unenforceable as a violation of the home-rule charter amendment.[9] *Marran*, 635 A.2d at 1177–78. Therefore, "[t]he critical fact is that the * * * legislation applies equally to all cities and towns." *Id.* at 1178 (quoting *City of Cranston v. Hall*, 116 R.I. 183, 186, 354 A.2d 415, 417 (1976)).

Here, similar to the situation in *Marran*, the challenged act applies on its face to all cities and towns. In our opinion, it is beyond question an enactment of general application. The act does not refer to the City of Central Falls or to any municipality by name. Indeed, the "Declaration of policy and legal standard" of § 45–9–1 asseverates that "[i]t shall be the policy of the state to provide a mechanism for the state to work with cities and towns undergoing financial distress" and "shall be carried out having due regard for the needs of the citizens of the state and of the city or town * * * all to the public benefit and good." Therefore, we are satisfied that the challenged act is an act of general application that indeed "applies alike" to all municipalities.[10]

**B**

**Whether the Act Affects the Form of Government of Any City or Town**

The second, and perhaps thornier, issue necessary to determine whether a chal-

lenged enactment violates protections afforded to municipalities under the home-rule charter amendment is whether the act affects the form of government of any city or town. *Marran*, 635 A.2d at 1178.

The mayor and city council specifically posit that " § 45–9–7 alters a municipality's form of government as it operates to anoint an appointed receiver with the powers of both the legislative branch and the executive branch of government[,] forming a new government * * *." Section 45–9–7(b) provides that "[t]he receiver shall have the following powers:

"(1) All powers of the fiscal overseer and budget commission under §§ 45–9–2 and 45–9–6. Such powers shall remain through the period of any receivership;

"(2) The power to exercise any function or power of any municipal officer or employee, board, authority or commission, whether elected or otherwise relating to or impacting the fiscal stability of the city or town including, without limitation, school and zoning matters; and

"(3) The power to file a petition in the name of the city or town under Chapter 9 of Title 11 of the United States Code, and to act on the city's or town's behalf in any such proceeding."

Section 45–9–7(c) further provides that:

"Upon the appointment of a receiver, the receiver shall have the right to exer-

9. We note that article 13, section 4, of the Rhode Island Constitution provides that when an act of the General Assembly does apply to only a single city or town under home-rule governance, or when the act is not one of general application, the General Assembly is not powerless, but approval of the act by a majority of the qualified electors of that city or town in a general or special election is necessary. *See In re Advisory Opinion to the House of Representatives*, 628 A.2d 537, 538 (R.I.1993). That, however, is not an issue here.

10. The Court in *Marran* observed that although the implementation of a challenged provision may affect each town or city differently, such differences in impact are not pertinent to the analysis of whether an enactment, on its face, applies equally to all cities and towns. *Marran v. Baird*, 635 A.2d 1174, 1178 (R.I.1994) (citing *City of Cranston v. Hall*, 116 R.I. 183, 186, 354 A.2d 415, 417 (1976)).

cise the powers of the elected officials under the general laws, special laws and the city or town charter and ordinances relating to or impacting the fiscal stability of the city or town including, without limitation, school and zoning matters; provided, further, that the powers of the receiver shall be superior to and supersede the powers of the elected officials * * *."

As all parties involved in this action readily acknowledge, and as is rationally inescapable, the powers granted to the receiver under the act are broad and encompassing; however, this fact alone does not lead us to conclude that the form of government of a city or town has been altered. In *Marran*, we held that the challenged legislation did not unconstitutionally alter a municipality's form of government under article 13, where the impact "on a local government [was] contained, delineated, and temporary." *Marran*, 635 A.2d at 1178.

The mayor and city council argue that the powers of the receiver are "dictatorial" in nature. We do not agree.[11] Although the powers of the receiver are broad and sweeping, they nonetheless are contained and channeled in at least three significant ways: (1) the standards imposed by several sections of the act set forth a deliberate and progressive mechanism by which the state provides the town or city with "varying levels of support and control depending on the circumstances",[12] § 45–9–1; (2) under oversight powers at § 45–9–7, "[t]he director of revenue may, at any time, and without cause, remove the receiver and appoint a successor, or terminate the receivership"; and (3), the receiver—having been appointed under express provisions of the act—is subject to administering any and all powers delegated in accordance with the stated policy purpose of the act as set forth within § 45–9–1. The powers delegated to the receiver are properly cabined because they are to be carried out with "due regard for the needs of the citizens of the state and of the city or town, * * * as will best preserve the safety and welfare of citizens of the state and their property, and the access of the state and its municipalities to capital markets, all to the public benefit and good." Section 45–9–1.

The mayor and city council attempt to distinguish *Marran* from this case, arguing that under the earlier version of the act, which was in effect when *Marran* was decided, the powers of the appointed budget commission "last[ed] no longer than the end of the fiscal year" and therefore were clearly, and by definition, "temporary." *Marran*, 635 A.2d at 1178; *see also* § 45–9–3 (repealed). By contrast, appellants point out that under the current version of the act, the director of the Department of Revenue, § 45–9–7, "shall appoint a receiver for the city or town for a period

**11.** *See Marques v. Pawtucket Mutual Insurance Co.*, 915 A.2d 745, 748 n. 7 (R.I.2007) ("It is not at all unprecedented for a legislature to authorize sweeping relief measures in order to cope with a critical economic situation.") (citing *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 439–40, 54 S.Ct. 231, 78 L.Ed. 413 (1934)).

**12.** *See* § 45–9–3 (delineating the appointment requirements and duties of a fiscal overseer); § 45–9–5 (specifying the reporting process of a fiscal overseer and the conditions requiring dissolution of the fiscal overseer concurrent with appointing a budget and review commission); § 45–9–6 (delineating the requirements for composition, the duties, and powers of a budget and review commission); § 45–9–7 (setting forth the process requirements for termination of a budget commission and the appointment, duties, and powers of a receiver); and § 45–9–8 (describing the circumstances that permit the director of the Department of Revenue to appoint a receiver in the event of a fiscal emergency).

as the director of revenue may determine." For this reason, they argue, "it cannot be definitely determined that a receivership initiated pursuant to R.I. Gen. Laws § 45–9–1 *et seq.* is not permanent," and thus, it constitutes an alteration of the local form of governance. We do not totally discount the underlying concerns of appellants, but we nonetheless conclude that the act does not violate the constitution.

■ In our opinion, the absence of an explicit sunset provision in the statutory framework is indeed a flaw, but we are keenly appreciative of the awesome responsibility of the General Assembly in situations such as this, where the municipality's financial viability is imperiled.[13] Despite the presence of the blemish that the absence of a sunset provision constitutes, we are satisfied that there are sufficient standards that can serve as an objective measure of when the receiver's oversight should terminate and that, accordingly, the statute passes constitutional muster.[14] The oversight by the director of the Department of Revenue must end within a reasonable time after the municipality regains financial stability in accordance with the guidelines set forth in the statute.[15] Moreover, judicial relief, by means of an action seeking a declaratory judgment and/or injunctive relief, would be available to municipalities that contend that a receiver has overstayed his statutory authority. Further, although the receivership is not limited to a specified durational term, that fact alone does not lead to the legal conclusion that the authority of the receiver is either unlimited or never-ending. Provisions of the act not only anticipate but also provide for the termination of any of the state-appointed agents—be it an overseer, a budget commission, or a receiver—when the municipality's fiscal health has improved. *See, e.g.,* § 45–9–10(a) (providing that an administration and finance officer reporting to the executive official of the municipality will be appointed "upon a determination, in writing, by the director of revenue that the financial condition of the city or town has improved to a level such that a fiscal overseer, a budget commission or a receiver is no longer needed"). Finally, and perhaps most significant to a temporal consideration, § 45–9–7(c) provides that, even when a receiver has assumed the powers of elected officials, these same elected officials "shall continue to be elected in accordance with the city or town

---

13. *See supra,* § 45–9–1, "Declaration of policy and legal standard."

14. Addressing this issue, the Supreme Judicial Court of Massachusetts, in response to a constitutional challenge to a receivership act promulgated by its legislature, held:

> "[T]he Receivership Act, taken as a whole, provides safeguards to control any abuses of the receiver's discretion. The receiver is required to submit annual reports to the Legislature 'summarizing the actions taken by [the] receiver during the prior fiscal year.' In this manner, the Legislature is kept informed of, and may take action in response to, any inappropriate acts of the receiver. Moreover, the receiver is under the constant supervision of the secretary. The Receivership Act is replete with provisions requiring the receiver to report to and obtain the approval of the secretary before taking certain actions. In addition, the Receivership Act provides that the receiver is appointed only for a one-year term and may be terminated at any time by the secretary for cause. These provisions provide adequate safeguards against abuses of the receiver's discretion." *Powers v. Secretary of Administration,* [412 Mass. 119] 587 N.E.2d 744, 750 (1992) (internal citations omitted). We observe that the Commonwealth's Receivership Act also vested authority in the secretary of administration to reappoint the receiver for additional one-year terms. *Id.* at 745.

15. In our view, it would seem that a period of oversight that exceeds two years from the appointment of a receiver might be unreasonable.

charter, and shall serve in an advisory capacity to the receiver." The express preservation of elected offices and the incumbents who hold those offices, even those serving under onerous impositions of state authority, leads us to conclude that the impact of the act on a town or city's form of government remains temporary.

Therefore, we are of the opinion that although there has been a temporary impact on the form of government in this instance, because the director of the Department of Revenue and receiver have invoked their statutory powers, that impact is channeled, incidental, and temporary. Under these circumstances, we hold that the legislation does not alter the form of government of any city or town generally, or of Central Falls in particular, "and consequently does not violate article 13." *Marran*, 635 A.2d at 1178.

## II

### The Act Does Not Violate the Separation of Powers Doctrine

 The mayor and city council vigorously argue that the act violates the separation of powers doctrine by permitting the collapse of separate and elected municipal executive and municipal legislative functions into one entity—here, the state-appointed receiver. We have held that "[t]he separation of powers doctrine prohibits the usurpation of the power of one branch of government by a coordinate branch of government." *Town of East Greenwich v. O'Neil*, 617 A.2d 104, 107 (R.I.1992). In addition, we have said without equivocation that "a constitutional violation of separation of powers [is] an assumption by one branch of powers that are central or essential to the operation of a coordinate branch." *In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1, 18 (R.I.1992) (emphasis omitted) (quoting *State v. Jacques*, 554 A.2d 193, 196 (R.I.1989)). However, we discern nothing in the Rhode Island Constitution, or in our case law, that guarantees, or even implicates, separation of powers considerations at the municipal level. After considering the arguments raised by the parties, we hold that the separation of powers doctrine is a concept foreign to municipal governance.[16]

 Moreover, after a close reading of the cases cited by appellants, we do not

---

16. To support this conclusion, see *Citizens for Reform v. Citizens for Open Government, Inc.*, 931 So.2d 977, 989–90 (Fla.Dist.Ct.App.2006), which, in marshalling authority, said:
"[T]he concept of Constitutional separation of powers simply does not exist at the local government level. See[,] e.g., *State, ex rel. Wilkinson v. Lane*, 181 Ala. 646, 62 So. 31, 34 (1913) (finding that the doctrine of separation of powers has 'no applicability, and [was] never intended to apply, to mere town or city governments or to mere town or city officials'); *Ghent v. Zoning Comm'n*, 220 Conn. 584, 600 A.2d 1010, 1012 (1991) ('The constitutional [separation of powers] provision applies to the state and not to municipalities, which are governed by charters and other statutes enacted by the legislature.'); *Poynter v. Walling*, 177 A.2d 641, 645 (Del.Super.Ct.1962) (finding that the

'constitutional requirement of separation of the three governmental departments applies to state government and not to the government of municipal corporations and their officers'); *Tendler v. Thompson*, 256 Ga. 633, 352 S.E.2d 388, 388 (1987) (concluding that the 'doctrine of separation of powers applies only to the state and not to municipalities or to county governments'); *Willsey v. Newlon*, 161 Ind.App. 332, 316 N.E.2d 390, 391 (1974) (noting that 'it has repeatedly been held that the separation of powers doctrine of Article III has no application at the local level'); *Bryan v. Voss*, 143 Ky. 422, 136 S.W. 884, 887 (1911) (noting that 'it has not been the policy of the state to separate legislative from executive functions in its government of the municipalities'); *Wilson v. City of New Orleans*, 466 So.2d 726, 729 (La.Ct.App.1985) (find-

agree that they support the proposition that the separation of powers doctrine independently exists at the municipal level. Instead, cases relied on by the appellants stand for a more narrow principle—and one that is consistent with our interpretation of the doctrine—that when a legislature has authorized a grant of power at the municipal level, it alone may interfere with that grant. *See State v. Holton,* 193 Md. App. 322, 997 A.2d 828, 845 (2010) (holding that "[w]hen the Legislature confers legislative power on a municipal body, a judicial or executive body may not interfere with that power, except as the Legislature authorizes") (quoting *D'Amato v. Superior Court,* 167 Cal.App.4th 861, 84 Cal.Rptr.3d 497, 505 (2008)); *Board of County Commissioners of Bernalillo v. Padilla,* 111 N.M. 278, 804 P.2d 1097, 1102 (1990) (observing that because the traditional basis for the separation of powers doctrine "derives from concern about * * * tyranny" and "because this danger is diminished for a level of government whose powers are subordinated to higher levels of government or otherwise limited," New Mexico's constitutional separation of powers provision "does not apply to the distribution of

power within local governments"). In our opinion, none of the cases cited by appellant stand for or even imply the independent existence of a separation of powers doctrine solely at the municipal level.

In *O'Neil,* 617 A.2d at 107, this Court held that there was no separation of powers violation when a state executive agency reviewed an enactment of a town council. We so held because the reviewing state agency and the town's legislative branch were not coordinate branches of government. *Id.* Rather, we said that "[t]he town is a creature of the state" and, as such, "[i]ts conflicting or overreaching legislative enactments are subordinate to those promulgated by a branch of state government." *Id.*

█ Although it is true that the home-rule amendment altered the traditional view that a municipality, as a creature of the state, has no inherent right to self-government except those powers granted to it by the state legislature, the right to self-government granted under our state constitution is limited strictly to local matters, and in no way affects the sovereignty of the state. *See Lynch,* 120 R.I. at 876–

---

ing that the doctrine of separation of powers 'applies only to the state and is not applicable to local governments'); *County Council for Montgomery County v. Investors Funding Corp.,* 270 Md. 403, 312 A.2d 225, 243 (1973) ('The constitutional doctrine of separation of powers is ... not applicable to local government.'); *State ex rel. Simpson v. City of Mankato,* 117 Minn. 458, 136 N.W. 264, 267 (1912) (finding that the separation of powers 'does not apply to municipal governments'); *Ball v. Fitzpatrick,* 602 So.2d 873, 878 (Miss.1992) (explaining that the 'system of checks and balances is not needed at the local level'); *Graziano v. Mayor and Township Comm.,* 162 N.J.Super. 552, 394 A.2d 103, 108 (1978) (finding that 'the separation of powers doctrine as it applies to federal and state governments is inapplicable to municipalities'); *Bd. of County Comm'rs v. Padilla,* 111 N.M. 278,

804 P.2d 1097, 1102 (1990) ('Traditional [separation of powers] doctrine derives from concern about the tyranny that can arise when one branch of government—the executive, legislative, or judicial—assumes the powers of another. (citation omitted). Apparently, because this danger is diminished for a level of government whose powers are subordinated to higher levels of government or otherwise limited, the New Mexico Constitution's provision on separation of powers ... does not apply to the distribution of power within local governments.'); *La Guardia v. Smith,* 288 N.Y. 1, 41 N.E.2d 153, 156 (1942) (finding that the 'theory of co-ordinate, independent branches of government has been held generally to apply to the national system and to the states, but not to the government of cities').'' (Alterations and omissions in the original.)

77, 391 A.2d at 122; *Marro v. General Treasurer of Cranston*, 108 R.I. 192, 196, 273 A.2d 660, 662 (1971); *State v. Krzak*, 97 R.I. 156, 162, 196 A.2d 417, 421 (1964); *City of Providence v. Moulton*, 52 R.I. 236, 246, 160 A. 75, 79 (1932). As in *O'Neil*, the tension of power here is between a state agency, acting through the director of the Department of Revenue, and a municipal government, acting through its mayor and city council. Thus, even if we were to recognize the separation of powers doctrine at the municipal level, the doctrine would be of no import here, because any alleged usurpation of power would not involve coordinate branches of government.

## III

### The Mayor and City Council's Compendium of Constitutional Claims

#### A

#### Substantive Due Process

The mayor and the city council contend that the act, specifically § 45–9–7, violates substantive due process. The appellants argue that the broad delegation of power to the receiver shocks the conscience because it permits the receiver to act arbitrarily and capriciously in violation of constitutional protections. Substantive due process is grounded in article 1, section 2, of the Rhode Island Constitution, which provides in pertinent part:

"All free governments are instituted for the protection, safety, and happiness of the people. All laws, therefore, should be made for the good of the whole; and the burdens of the state ought to be fairly distributed among its citizens. No person shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the laws."

■■■ We have embraced the position that "the due process clause includes a substantive component which guards against arbitrary and capricious government action, even when the decision to take that action is made through procedures that are in themselves constitutionally adequate." *Brunelle v. Town of South Kingstown*, 700 A.2d 1075, 1084 (R.I.1997) (quoting *Sinaloa Lake Owners Association v. City of Simi Valley*, 882 F.2d 1398, 1407 (9th Cir.1989)). When no fundamental right is at issue, a party seeking to establish a substantive violation of due process "must establish that the challenged provisions are 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'" *Kaveny v. Town of Cumberland Zoning Board of Review*, 875 A.2d 1, 10 (R.I.2005) (quoting *Brunelle*, 700 A.2d at 1084); *see also Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Additionally, we have said that "substantive due process prevents the use of governmental power for purposes of oppression, or abuse of governmental power that is shocking to the conscience * * *." *L.A. Ray Realty v. Town Council of Cumberland*, 698 A.2d 202, 211 (R.I.1997).

It is undisputed that "[t]he fiscal collapse of a [city or town] can affect the entire state's financial interests * * *." *Marran*, 635 A.2d at 1178–79. As we said in that case:

"The General Assembly has consistently recognized the importance of sound fiscal practices in cities and towns by enacting statutes ensuring financial stability notwithstanding the provisions of home-rule charters.

"[The provision] clearly affects a matter of statewide concern because (1) the state has consistently exercised oversight over municipal budgets and debt obligations; (2) the insolvency of even a single city or town sufficiently threatens

the credit of those outside a home-rule city or town; and (3) the uniform regulations provided * * * are desirable and necessary to ensure the state's objectives of fiscal stability essential to good government." *Id.* at 1179.

■■■ Here, the mayor and city council simply cannot meet the high burden of establishing that the act is clearly arbitrary and unreasonable, having " 'no substantial relation to the public health, safety, morals, or general welfare.' " [17] *Brunelle,* 700 A.2d at 1084. To the contrary, the act explicitly states at § 45–9–16, that "[t]his chapter being necessary for the welfare of the state and its inhabitants shall be liberally construed in order to effectuate its purposes." *See also* § 45–9–1 (stating that the act shall be carried out "in such a manner as will best preserve the safety and welfare of citizens of the state and their property * * * all to the public benefit and good"). Because there has been no showing that the act bears no substantial relation to these purposes, we cannot say that the delegations of power under the act shock the conscience, are arbitrary or capricious, or violate substantive due process.

### B

### Vagueness and the Nondelegation Doctrine

The mayor and city council also contend that the act is unconstitutionally vague and as such violates due process. To begin, we observe that vagueness challenges implicate, at least to some extent, the nondelegation doctrine. *Fitzpatrick v. Pare,* 568 A.2d 1012, 1013 (R.I.1990). It is not absolutely clear to us that a nondelegation challenge is before our Court upon appeal;

however, we note that appellants cite to the fact that the nondelegation doctrine was argued in the proceedings below. Additionally, appellees present a vigorous argument that the nondelegation doctrine has not been violated. Although we are inclined to agree with the position, as articulated in the amicus brief of the Attorney General, that the nondelegation challenge has been abandoned on appeal, we nonetheless address the issue in the interests of thoroughness and the overall importance of this case.

■■■ As to the contention that the act is unconstitutionally vague, appellants specifically point to provisions in the act that permit a receiver to be appointed after a finding by the director of the Department of Revenue that a "fiscal emergency" exists. *See* § 45–9–8. "Vagueness challenges under the [D]ue [P]rocess [C]lause rest principally on lack of notice." *State v. Russell,* 890 A.2d 453, 460 (R.I. 2006) (quoting *State v. Sahady,* 694 A.2d 707, 708 (R.I.1997)). "The standard used by this court to determine vagueness of a statute is dependent upon the nature of the statute itself * * *." *Fitzpatrick,* 568 A.2d at 1013 (citing *City of Warwick v. Aptt,* 497 A.2d 721, 724 (R.I.1985)). A legislative enactment is subject to attack on the grounds of constitutional vagueness when it "fails to delineate or to suggest any standards and contemporaneously fails to properly delegate rule making powers sufficient to provide the omitted standards * * *." *Id.* (citing *United Nuclear Corp. v. Cannon,* 553 F.Supp. 1220, 1235 (D.R.I. 1982)). "[I]t is well settled that a statute is unconstitutionally vague if it lacks explicit standards from its application and thus delegates power that enables enforcement officials to act arbitrarily with unchecked discretion." *Id.* (citing *Grayned*

---

**17.** No fundamental right has been identified by appellants as being at issue, nor has this Court determined that such a right is implicated.

*v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Finally, "[a] statute is unconstitutionally vague if it compels 'a person of average intelligence to guess and to resort to conjecture as to its meaning and/or as to its supposed mandated application.'" *Kaveny,* 875 A.2d at 10 (quoting *Trembley v. City of Central Falls,* 480 A.2d 1359, 1365 (R.I. 1984)).

The mayor and city council highlight (1) the fact that the act does not provide a definition for the term "Fiscal Emergency" and (2), that because § 45–9–8 empowers the director of the Department of Revenue to appoint a receiver after determining that a fiscal emergency exists, "without having first appointed a fiscal overseer or a budget commission," constitutionally impermissible vagueness results.[18] Although it is true that the term "fiscal emergency" is undefined by the statute, this single factor does not determine constitutional vagueness, nor does the absence of definition nullify the enactment's "supposed mandated application." *Kaveny,* 875 A.2d at 10 (quoting *Trembley,* 480 A.2d at 1365).

■■■ First, in its entirety, § 45–9–8 requires that the director of the Department of Revenue must make a determination that a city or town is facing a fiscal emergency "in consultation with the auditor general." Section 45–9–8 simply does not authorize the director of the Department of Revenue to determine at her sole discretion that a fiscal emergency exists. Second, such a standard is consistent with how we have interpreted the limits of permissible delegation, recognizing that modern problems of ever-increasing complexity require administrative expertise. *Milardo v. Coastal Resources Management Council of Rhode Island,* 434 A.2d 266, 270 (R.I. 1981) (citing *Davis v. Wood,* 427 A.2d 332, 335–36 (R.I.1981) (recognizing the need of a legislative body to employ an administrative agent to effectuate the beneficial purposes of legislation)). To this point, in *City of Warwick v. Warwick Regular Firemen's Association,* 106 R.I. 109, 113, 256 A.2d 206, 209 (1969), we said:

> "Where the purposes of the antecedent legislative enactment may be best accomplished through the employment of an agent acting in its stead, the legislature may delegate to that agent a sufficient portion of its power to enable it to make the statute operative."

Here, we are satisfied that the delegation of power to the director of the Department of Revenue to determine and declare, after consultation with the auditor general of the state, that a "fiscal emergency" exists in a particular municipality is not unconstitutionally vague. A person of average intelligence need neither guess nor speculate about the meaning or intended application of the act. *See Kaveny,* 875 A.2d at 10. This is all the more apparent when one reads the act in its entirety, and particularly the crafted language of § 45–9–3(b), which sets forth five distinct factors that are relevant to a finding that the fiscal well-being of a city or town may be threatened.[19] These enumerated factors

---

18. At oral argument, counsel for the mayor and city council conceded that at all relevant times a fiscal emergency existed in the city. Moreover, in the verified petition for appointment of a receiver adopted pursuant to a resolution of the city council dated May 18, 2010, and signed by Mayor Moreau, the parties defined the situation faced by Central Falls in terms clearly indicating a fiscal crisis.

Such representations and descriptions included: "the City is fiscally insolvent", "its dire fiscal situation", and "[i]n light of its extreme financial stress * * *."

19. Although it is true that § 45–9–8 does not require reference to § 45–9–3(b), we are not persuaded that such a mandate would be necessary to save § 45–9–8 from constitutional vagueness. It is noteworthy that the use of

include projected deficits, missed audit filings, downgrading by a recognized rating agency, inability to access credit markets on reasonable terms, and a municipality's failure to respond timely to state requests for financial information. Section 45–9–3(b)(1 to 5).

 With respect to the principle that "a statute is unconstitutionally vague if it lacks explicit standards from its application and thus delegates power that enables enforcement officials to act arbitrarily with unchecked discretion," vagueness challenges can be invoked by implicating the nondelegation doctrine. *Fitzpatrick*, 568 A.2d at 1013. Derived from article 4, sections 1 and 2, of the Rhode Island Constitution, the nondelegation doctrine arises when it is contended that there has been an impermissible delegation of legislative power to an administrative agency. *Milardo*, 434 A.2d at 270. "The dual purposes of the doctrine are the protection of citizens against discriminatory and arbitrary actions of public officials, * * * and the assurance that duly authorized, politically accountable officials make fundamental policy decisions." *Marran*, 635 A.2d at 1179 (citing *Bourque v. Dettore*, 589 A.2d 815, 817 (R.I.1991)).

In analyzing constitutional challenges that have been predicated on the doctrine, we have said that delegations are reasonable, and thus constitutional, as long as the legislature authorizing the grant of power develops intelligible standards or principles to confine and guide the agency's actions. *Marran*, 635 A.2d at 1179 (citing

*Davis*, 427 A.2d at 336). "In making this determination, 'we must read the act as a whole.'" *Marran*, 635 A.2d at 1179 (quoting *Davis*, 427 A.2d at 336).

 We are of the opinion that the grant of authority to the director of the Department of Revenue is amply confined and guided by intelligible standards and principles. As previously discussed, § 45–9–1 effectively specifies the policy by which the receiver, or any official tasked by the director of the Department of Revenue with administering the act, are directed and constrained. Moreover, we are satisfied that the deliberate triggering mechanisms of the act that provide for "varying levels of support and control depending on the circumstance" are intelligible and demonstrate an architecture of staged delegations of power constructed to respond to the requisite degree of fiscal crisis. *See* § 45–9–1.

For the aforementioned reasons, we hold (1) that as to the specific point regarding the determination of "fiscal emergency," as well as to the act generally, appellants' constitutional vagueness argument is without merit, and (2), that the delegation of power granted to the Department of Revenue pursuant to the act is permissible.

## C

### Absurd Results [20]

The mayor and city council argue in their brief that the act "breeds arbitrary

---

the five distinct factors under § 45–9–3(b) enables the director of the Department of Revenue to appoint a fiscal overseer "in his or her sole discretion." As we have noted, no such solitary discretion is permitted under § 45–9–8.

**20.** Within the "Table of Contents" of appellants' brief, it is contended that "overbreadth of the R.I. Gen. Laws § 45–9–1 *et seq.* breeds

arbitrary and capricious action * * *." However, we have said that "[s]imply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." *Kaveny v. Town of Cumberland Zoning Board of Review*, 875 A.2d 1, 10 (R.I.2005) (quoting *Wilkinson*

and capricious action such that it shocks the conscience" and produces absurd results unintended by the Legislature.

■ In making their argument, appellants give several examples designed to demonstrate how grave abuses and absurd results could occur through application of the act. The record, however, is devoid of facts that overcome the clearly speculative nature of these examples. In such circumstances, "[i]t is well settled that this [C]ourt will not pass upon the constitutionality of a statute where, if it were found to be unconstitutional, the party who had challenged its constitutionality would take nothing." *State v. Perry*, 118 R.I. 89, 99, 372 A.2d 75, 81 (1977) (quoting *State ex rel. Widergren v. Charette*, 110 R.I. 124, 128, 290 A.2d 858, 860 (1972)). Furthermore, "[e]mbedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Perry*, 118 R.I. at 99, 372 A.2d at 81 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

Here, as an example of what they contend would produce absurd results, appellants point with particularity to § 45–9–7(c), which grants the receiver all powers "relating to or impacting the fiscal stability of the city or town including, without limitation, school and zoning matters * * *." This, they argue, is but one illustration of the excessive power given to the receiver, and in the case of zoning, would allow him to be, in essence, a one-person zoning board, with the unlawful flexibility to brush aside all the statutory protections set forth in the Rhode Island Zoning Enabling Act of 1991 (G.L.1956 chapter 24 of title 45), and the municipal zoning ordinances, including notice to the abutters of proposed changes and public notice of hearings. We consider these arguments to be speculative, and we are not persuaded by them.

■ First, on its face, there is no inconsistency between the statute and the notice provisions of the zoning law. Section 45–9–15 says, "[i]nsofar as the provisions of this chapter are inconsistent with the provisions of any charter or other laws or ordinances, general, special, or local, or of any rule or regulation of the state or any municipality, the provisions of this chapter are controlling." But, because the act provides only that the receiver may exercise the powers of an authority or office to the limits of that authority or office, and no further, we see no inconsistency between the temporary power vested in the receiver and the notice and hearing requirements in zoning matters.

Second, there is simply no record of any person complaining of wrongful or abusive conduct by the receiver in the area of zoning or any of the other possibly compelling but fictive examples presented by appellants. We do not hesitate to say that judicial relief would be available to any person who could demonstrate excessive conduct by the receiver in the area of zoning, or, for that matter, a failure of the director of the Department of Revenue to enforce and administer her duties under the act—including, but not limited to, for instance, her duty to terminate a receivership once the fiscal conditions of a municipality are sufficiently improved. But, since the record is devoid of any such contention or conduct, appellants' complaints about outcomes that are absurd or

*v. State Crime Laboratory Commission*, 788 A.2d 1129, 1131 n. 1 (R.I.2002)). Because the issue of constitutional overbreadth has not been meaningfully developed, we decline to address that issue.

shocking to the conscience, particularly resulting from the receiver's zoning power, are completely speculative in nature. In the face of a broadside attack on the constitutionality of the statute as a whole, we need not address a contention that never may ripen.

Lastly, the act contains a severability clause at § 45–9–17. In the event of a future determination of abuse with regard to a ripe zoning contention, the remainder of the statute would not be affected.[21] Thus, as to the mayor and city council's overbreadth and "absurd results" arguments, we believe that the alarm sounded by the appellants rings with speculation and conjecture. To the extent these arguments have been developed and presented, they are without merit.

### D

### Equal Protection

The mayor and the city council contend that the act violates the equal protection clause of the state constitution, located at article 1, section 2, which proscribes "any person being denied equal protection of the laws." Specifically, they argue that § 45–9–9,[22] entitled "Collective bargaining agreements," impermissibly creates two classes, union members and nonunion members, which are subject to different treatment under the law. The receiver counters that this issue is not properly before us on appeal because it was not raised before the trial justice during trial and appears nowhere in his decision, but rather, was first raised in connection with a post-decision motion for a stay of that decision and for reconsideration. We have said that our raise-or-waive rule generally precludes this Court from considering on appeal issues that have not been properly presented before the trial court. *State v. Bido,* 941 A.2d 822, 828–29 (R.I.2008); *Chase v. Bouchard,* 671 A.2d 794, 795 (R.I. 1996) ("One of our most settled doctrines

---

21. Moreover, in response to the argument that the act creates absurd results unintended by the Legislature, we have said that "[i]n crafting a mechanism to balance * * * sometimes competing interests, * * * '[t]he Legislature is presumed to know the state of existing law when it enacts or amends a statute.'" *State v. Greenberg,* 951 A.2d 481, 491 (R.I. 2008) (quoting *State v. DelBonis,* 862 A.2d 760, 768–69 (R.I.2004)).

22. In its entirety, § 45–9–9 reads:
"Notwithstanding chapter 28–7 of the general laws or any other general or special law or any charter or local ordinance to the contrary, new collective bargaining agreements and any amendments to new or existing collective bargaining agreements (collectively, 'collective bargaining agreements') entered into by the city or town or the school department shall be subject to the approval of the fiscal overseer, budget commission or receiver if the fiscal overseer, budget commission or receiver is in effect at the time. No collective bargaining agreement shall be approved under this section unless the fiscal overseer, budget commission or receiver has participated in the negotiation of the collective bargaining agreement and provides written certification to the director of revenue that after an evaluation of all pertinent financial information reasonably available, the city's or town's financial resources and revenues are, and will continue to be, adequate to support such collective bargaining agreement without a detrimental impact on the provision of municipal services. A decision, by the fiscal overseer, budget commission or receiver, to disapprove of a collective bargaining agreement under this section shall be made in a report to the parties; provided, however, that the report shall specify the disapproved portions of the agreement and the supporting reasons for the disapproval. This section shall not be construed to authorize a fiscal overseer, a budget commission or a receiver under this chapter to reject or alter any existing collective bargaining agreement, unless by agreement, during the term of such collective bargaining agreement."

in this jurisdiction is that a matter not raised before the trial court may not be raised for the first time on appeal.").

A review of the record confirms that the equal-protection challenge was first presented to the Superior Court for consideration in the appellants' motion to reconsider their motion to stay the October 21, 2010 judgment of the Superior Court. At that time the trial justice considered the argument on its merits and ruled on it. Although we are not persuaded by the argument of appellants, we nonetheless believe that it has some impact on public policy considerations, and because the matter was considered and ruled on by the trial justice, we briefly will discuss the issue on its merits.

■■■ This Court has held that equal protection of the laws generally "proscribes governmental action which treats one class of people less favorably than others similarly situated." *Perrotti v. Solomon*, 657 A.2d 1045, 1049 (R.I.1995). Though "[a]n equal protection violation may be established by showing that an impermissible classification has occurred," it is equally true that equal protection " 'does not require perfectly equal treatment for every individual.' " *Id.* (quoting *Felice v. Rhode Island Board of Elections*, 781 F.Supp. 100, 105 (D.R.I.1991)). Rather, "[w]ith respect to equal protection, '[i]t is well established that where it has not been shown that a 'fundamental right' has been affected or that the legislation sets up a 'suspect classification,' a statute will be invalidated * * * only if the classification established bears no reasonable relationship to the public health, safety, or welfare.' " *Kaveny*, 875 A.2d at 11 (quoting

*Sweetman v. Town of Cumberland*, 117 R.I. 134, 151, 364 A.2d 1277, 1288 (1976)).

■■■ The mayor and city council argue that "no set of facts can reasonably be conceived to justify such a distinction [*i.e.*, between union members and non-union members]." To the contrary, however, municipal workers subject to a collective bargaining agreement are not similarly situated to elected officials. Union members are not selected for their jobs by the voting ballot, as are elected officials, and they neither develop nor implement public policy. Additionally, the relationship of elected officials to the public trust and welfare is profoundly different from that of the ordinary workers, or even police officers or firefighters, who make up collective bargaining organizations, as is the analysis and process that result in their relative compensation and benefits. Therefore, because union members are not similarly situated to elected public officials, we need go no further, and we hold that the act, as it may apply differently to union members and elected public officials, does not violate the equal protection clause.

## E

### The Mayor's Procedural Due Process and "Removal" Claims

Also upon appeal before us is Mayor Moreau's contention that the Superior Court erred in determining that the mayor, a publicly elected official, does not have a protected property interest in the elected office such that procedural due process is required.[23]

■■■ Under the Rhode Island Constitution, procedural due-process protections

23. We note that before the Superior Court, appellants advanced the argument that the act violates procedural due process because it essentially removed them from office without prior notice or hearing. On appeal before us, this argument is made exclusively as to the removal of the mayor. However, our rationale would apply equally to the members of the city council.

are grounded in article 1, section 2, which states that "[n]o person shall be deprived of life, liberty, or property without due process of law * * *." Procedural due process ensures that notice and an opportunity to be heard precede any deprivation of a person's life, liberty, or property. *State v. Germane,* 971 A.2d 555, 574 (R.I. 2009) (citing *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). Though a state may choose to create stronger constitutional protections than those afforded by the federal constitution, "[t]he applicability of the constitutional guarantee of procedural due process depends in the first instance on the presence of a legitimate 'property' or 'liberty' interest within the meaning of the [federal constitution]." *Arnett v. Kennedy,* 416 U.S. 134, 164, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring). Only when a legitimate property or liberty interest exists does a court determine what process is due. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

At trial, the mayor and city council argued that removal of an elected official, without notice and a hearing, explicitly contravenes our prior holdings in *Doris v. Heroux,* 71 R.I. 491, 494, 47 A.2d 633, 635 (1946) (member and clerk of the board of canvassers appointed by vote of the city council of Woonsocket could be removed for abandonment only upon due process of law) and *Brule v. Board of Aldermen of Central Falls,* 54 R.I. 472, 473, 175 A. 478, 479 (1934) (superintendent of highways and sewers, appointed by vote of the board of aldermen to a two-year term, could be removed from that appointed position only upon due process of law). However, those cases are not apposite to the situation before us. In the aforementioned cases, the officials claiming a protected interest in their positions were essentially appointed officials, whose appointments were se-

cured by votes of the city council. Here, by contrast, the mayor and city council are officials placed into office by the vote of the electorate at large. This distinction is critical; moreover, the mayor and city council have not been removed from public office. As we have opined, *supra,* the act expressly provides for the preservation of elected offices and the incumbents who hold those offices, and any impact on those offices and incumbents is temporary.

We decline appellants' invitation to declare that publicly elected officials have a property interest in an elected office sufficient to merit procedural due process before they may be removed. Rather, after much consideration of the issue, we share the broadly held view that was well expressed and articulated at the beginning of the twentieth century in *Taylor v. Beckham,* 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187 (1900). In that case, which considered the rights of the parties in a post-election challenge involving the governorship of Kentucky, the United States Supreme Court held that an officer elected by the general public does not have a property right in his elected office that is subject to due process of law. *Id.* at 577, 20 S.Ct. 890. The Court in *Taylor* wrote:

"The decisions are numerous to the effect that public offices are mere agencies or trusts, and not property as such. Nor are the salary and emoluments property, secured by contract, but compensation for services actually rendered. * * * *In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right." Id.* (Emphasis added.)

*See also Snowden v. Hughes,* 321 U.S. 1, 7, 64 S.Ct. 397, 88 L.Ed. 497 (1944) (reaffirming *Taylor* and holding that a senatorial candidate does not have a property inter-

est, secured by due process, in an elected office). In our view, the principle that elected officers are agents or trustees subject to the needs and best interests of the citizenry, and that elected officials serve in an office that can only be described as the property of the people, is basic to our democracy.[24] A full half century before *Taylor,* the United States Supreme Court fixed this venerable principle most squarely, saying:

> "[A]n office created for the public use, and the regulation of the salary affixed to such an office * * * do[es] not come within the import of the term *contracts,* or, in other words, the vested, private personal rights thereby intended to be protected. They are functions appropriate to that class of powers and obligations by which governments are enabled, and are called upon, to foster and promote the general good; functions, therefore, which governments cannot be presumed to have surrendered, if indeed they can under any circumstances be justified in surrendering them." *Butler v. Commonwealth of Pennsylvania,* 51 U.S. 402, 417, 10 How. 402, 13 L.Ed. 472 (1850).

*See also* 3 Eugene McQuillin *The Law of Municipal Corporations* § 12.117 at 571–74 (3d ed. 2010) (explaining that under our democratic system of government, elected offices are not held by grant or contract, and that no individual has a private property right or interest therein). Thus, because it is our firm opinion that the rela-

tion of a publicly elected officer to the public is inconsistent with either a property or a contract interest, we hold that Mr. Moreau does not hold a property interest in the Office of Mayor that is subject to the requirements of procedural due process.

Finally, we observe that because an elected office is an agency of trust inuring from and for the benefit of the people, an elected official cannot claim a fundamental right to such an office. Thus, to any extent, express or implied, that the appellants may suggest that substantive due process may be violated by the alleged "removal" of elected officials by the receiver, we hold that such a contention is not supported by the law. Further, we agree with the interpretation of the Superior Court, which held that the mayor and city council have not been removed from office but are temporarily acting in an advisory capacity to the receiver.[25]

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court and remand the papers in this case to that tribunal.

---

**24.** Consideration of the current question makes relevant once again what is perhaps a uniquely democratic maxim, attributed to President Grover Cleveland: "Public office is public trust."

**25.** This position is strongly supported by a plain reading of §§ 45–9–7(c) and 45–9–10,

envisioning the role of the offices upon a reduction in authority and the method for returning such authority to the elected officials once the city or town returns to sufficient stability in the eyes of the state.