July 2, 2019

**Supreme Court**

No. 2016-77-Appeal.
No. 2016-78-Appeal.
(PC 13-3287)

Glen Hebert et al.                    :

v.                    :

The City of Woonsocket, by and through    :
    its Mayor, Lisa Baldelli-Hunt, et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2016-77-Appeal.
No. 2016-78-Appeal.
(PC 13-3287)
(concurrence begins on page 35)
(concurrence and dissent begins on page 37)
(concurrence begins on page 43)

Glen Hebert et al. :

v. :

The City of Woonsocket, by and through : its Mayor, Lisa Baldelli-Hunt, et al.

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.** The defendants, the City of Woonsocket and the Woonsocket Budget Commission (the WBC) (collectively, the City), appeal from a decision and judgment of the Superior Court that granted a preliminary injunction in favor of the plaintiffs, a number of retired Woonsocket police officers. The trial court restrained the City from changing the terms of the plaintiffs' retiree health insurance. On appeal, the City argues that the trial justice erred by finding the following: (1) that the plaintiffs had a vested contractual right to free lifetime health benefits for themselves and their beneficiaries; (2) that the WBC was not empowered with the statutory authority to make changes to the plaintiffs' health care benefits; (3) that the WBC violated the Contract Clause of the Rhode Island Constitution when it required the plaintiffs to pay for their health insurance under a new uniform health care plan applicable to

all retirees and employees; and (4) that the plaintiffs established that they suffered irreparable harm. For the reasons set forth in this opinion, we vacate the judgment of the Superior Court.

# I

## Facts and Travel

The essential facts of this case, which are largely undisputed, are as follows. Within the past two decades, the City of Woonsocket has fallen on hard times. The City has been designated as one of Rhode Island's seven "distressed communities," defined as those having the "highest property tax burdens relative to the wealth of taxpayers." General Laws 1956 § 45-13-12. In fact, as of 2012, 19.9 percent of its families lived in poverty, compared with the state average of 9.7 percent; the median household income was $34,518, compared with the state average of $54,900; 72 percent of its students were eligible for a subsidized lunch, compared to just 46 percent for the state average; and 64.9 percent of its students graduated from high school in four years, compared with the state average of 77.1 percent. Moreover, from 2000 to 2010, the City's population declined by 4.7 percent, a time during which the state's population increased by 0.7 percent. The trend was equally distressing in foreclosure rates: in 2009 alone, the City's foreclosure rate was 3.6 percent, more than double the state's rate of 1.54 percent. Ominously, major retailers such as Walmart, Lowe's, and Staples had all left the City.

The City's fiscal woes, perhaps hidden from view, began years earlier, however, when it was confronted with unfunded pension obligations. In 2002, the City faced a pension liability of $81,203,910, but it had only $2,172,718 in assets, or a dangerous 2.68 percent of full funding. In response to the pension woes of Woonsocket and several other communities, the General Assembly enacted legislation—Public Laws 2002, ch. 10—that authorized the City to issue up to $90 million in pension bonds, to be amortized over a thirty year period. *See* P.L. 2002, ch. 10, §

1. The law required, however, that if the City's pension plan then fell below 100 percent funding, the City was required to eliminate that shortfall within five years and return the funding to 100 percent. *See id.* at § 8.

The bonds that were sold under authority of the legislation replenished the City's pension back to 100 percent funding, but when the Great Recession struck, the pension fund value again declined.[1] In the five year period from July 1, 2007, through July 1, 2012, the fund's assets dropped from $90,034,746 to $55,902,219, which caused the assets-to-liabilities ratio to fall below 60 percent and required immediate action under state law.[2]

In fiscal year 2008, the City was able to contribute only $32,100 of the $2,470,633 that was required by the law; in fiscal year 2010, only $15,612 of the required $7,643,873; and in fiscal year 2012, only $1,006,677 of the required $10,545,371.

That was not the only source of fiscal bad news for Woonsocket. The Great Recession also caused the state to impose budget cuts in municipal aid, which had a direct and disastrous impact on the City's finances. Between 2007 and 2011, the state decreased the City's general revenue sharing and state aid by a staggering $13,164,929, or 22.3 percent. Indeed, in total, the City lost $54,467,452 in state aid from 2007 to 2013. Further, the Woonsocket Education Department was receiving fewer state education funds than it had received in fiscal year 2007,

---

[1] The Great Recession occurred during the mid to late 2000s. It began when the United States housing market crashed and large amounts of mortgage-backed securities and derivatives lost significant value. *See In re Fannie Mae 2008 Securities Litigation*, 742 F. Supp. 2d 382, 391 (S.D.N.Y. 2010). The housing market crash spiraled into a global phenomenon, drastically affecting countless markets and was considered to be the worst economic downturn since the Great Depression. *See Federal Housing Finance Agency v. Nomura Holding America, Inc.*, 104 F. Supp. 3d 441, 538-39 (S.D.N.Y. 2015); *City of Roseville Employees' Retirement System v. Sterling Financial Corporation*, 963 F. Supp. 2d 1092, 1101 (E.D. Wash. 2013).
[2] The fund was also classified as being under "critical status" as defined by the Rhode Island Retirement Security Act, which is defined "as of the beginning of the plan year, a plan's funded percentage for such plan year is less than sixty percent (60%)." General Laws 1956 § 45-65-4(3).

even though the state had initiated a gradual phase-in of increased educational funding in 2012.[3] As a result of the decreased funding, the City's budget deficit increased from $197,178 for fiscal year 2008 to $12,247,266 for fiscal year 2010.

The record reveals that the City took drastic measures to address its undeniable fiscal crisis. It increased taxes to the maximum permitted under state law and exceeded that maximum by taxing at or above the statutory 4 percent levy cap for most years between 2008 to 2012; it also had the highest average increase in property tax levies over this period among any of the City's comparable benchmark communities, at 6.44 percent.[4] Moreover, the City imposed a trash collection fee in an effort to generate approximately $1 million annually in revenue, and negotiated payments in lieu of taxes with certain local property owners to generate an additional $3.2 million annually.

On the expenditure side of its budget, the City also attempted to reduce its obligations by closing a school, turning off street lights, and abandoning all projects to rebuild its infrastructure and replace equipment except those that required emergency repairs. It also cut back on its contributions to the pension fund, the consequences of which were exacerbated by the reduction in state aid as well as the decline in pension investment income caused by a battered stock market. Even with these actions, however, drastic by any measure, the City continued to experience a budget deficit of roughly $2.5 million.

The struggling City sought and received concessions from many of the collective bargaining units that represented its employees. The police union agreed to reduce staff and lower its expected wage increase. Additionally, it agreed that new hires would be required to

---

[3] State education aid did not return to its pre-recession level, in absolute dollar terms, until fiscal year 2014.

[4] In addition to Woonsocket, the benchmark communities are Central Falls, Cranston, East Providence, Johnston, North Providence, Pawtucket, and West Warwick.

make copayments on their health insurance and, for the first time, that new hires would contribute a 20 percent copayment on health insurance premiums after retirement.

The firefighters union similarly agreed to reduce minimum staffing, implement a twenty-four hour shift, revamp its health care plan design, and use civilians for dispatch services in lieu of firefighters. Those measures with the firefighters union saved over $3.5 million for the City over its three year contract period. That, however, did not end the City's efforts. Woonsocket laid off eleven firefighters in 2009 and was forced to briefly "brownout" a ladder truck in 2010.

Finally, the Woonsocket Education Department unions, which already had made concessions to reduce the City's health care coverage contributions for teachers, paraprofessionals, and other nonteaching personnel, also agreed that their members would make 10 to 20 percent co-share contributions to health insurance costs under a deductible plan similar to a plan that had been accepted by the firefighters union. The teachers also did not receive a salary increase for four years and they gave up altogether a deferred payment that had previously been negotiated for in lieu of a salary increase. Other municipal unions agreed to contribute to health care costs, suspend wage increases for an additional two years, and eliminate positions.

The record reveals that those concessions, as far reaching as they were, did not eliminate the budget deficit and, in April 2010, Moody's Investor Services downgraded the City's bond rating to non-investment-grade Ba1, or what is more commonly referred to as "junk bond status." In an effort to further reduce the deficit, the City, in July 2010, issued $11.5 million in deficit reduction bonds, obligating itself to very high interest rates as a result of its poor bond rating. Although that bond issuance may have resulted in an improved cash flow, it also carried the natural consequence of increasing the City's cumulative debt load to a staggering total of $192,815,937 in fiscal year 2012. At that time, the City's debt ratio was 14.24 percent of

equalized weighted assessed valuations. That was by far the highest in the state; the state average was only 1.47 percent.

Adding fuel to an already blazing fire, in fiscal year 2010, the Woonsocket Education Department experienced a $3 million deficit. By June 2012, that deficit had increased to nearly $9.78 million, leaving the City with a cumulative unassigned fund deficit of $7.146 million. The City sought authorization from the General Assembly to impose up to $6.6 million in a supplemental tax, but that proposal was not passed by the legislature. Payroll checks began to be dishonored, and the City's school committee contemplated ending the school year early because it was simply running out of money.

By the end of fiscal year 2012, the City was responsible for bills surpassing $10.2 million in total, nearly $4 million of which was more than ninety days overdue. At the same time, the City pension fund for retired police officers and firefighters who were not members of the Municipal Employees Retirement System (MERS) fell into "critical status" as defined by the Retirement Security Act, G.L. 1956 chapter 65 of title 45, which required the City to enact a plan that would enable it to emerge from that status within twenty years. This burden was in addition to the already existing requirement that the City comply with the previously enacted legislation allowing it to borrow $90 million so that it could replenish the pension fund to full funding within five years. To comply with both of those state laws, the City needed to make an annual pension fund contribution of $11,615,000 for each fiscal year from 2013 to 2017. As former Mayor Leo Fontaine elaborated, the situation had turned into a "perfect storm of problems" that the City could not survive without assistance. By that point in time, it is no exaggeration to conclude that the City was in a fiscal death spiral.

In May 2012, the City requested, and the Director of the Rhode Island Department of Revenue appointed, a budget commission, the WBC, under the Fiscal Stability Act, G.L. 1956 chapter 9 of title 45 (the FSA). The WBC determined that, if the City maintained its status quo, it would face a cumulative budget deficit of $105.5 million by the end of fiscal year 2017. The WBC requested and received advancements in state aid that totaled $3,148,621 into June 2012, $12,422,538 into July 2012, and another $12,799,650 into July 2013, to allocate to the City's education department. It then tried without success to obtain authorization to impose another supplemental tax, and it worked with vendors to prevent a termination of services, including health insurance.

In accordance with the FSA, the WBC developed a five year plan. The WBC's five year plan first increased revenues in the City in three ways: (1) the General Assembly approved a maximum $2.5 million supplemental property tax for fiscal year 2013; (2) there was a 4 percent levy increase for fiscal year 2014; and (3) the City reduced the homestead exemption for single-family/condominium owner-occupied homes, two-family homes, and three-family homes. Those measures increased the property tax bill for owners of single-family/condominium owner-occupied homes by 22.9 percent in one year. As a result, the City had the highest residential and commercial tax rates among the eight benchmark communities, as well as the highest effective tax rate and the highest median family income tax rate. Additionally, it also had the second highest per capita income adjusted tax rate and the second highest owner-occupied single-family residential effective tax rate among the eight benchmark communities.

Next, the WBC reduced staffing and reorganized municipal departments. The City represents that, in fiscal year 2014, the City maintained a complement of eighty-six police officers, far below the prior contractual mandate of 101. That single change saved $1,124,756 in

fiscal year 2014. Likewise, for fiscal years 2015 through 2018, the City indicates that it reduced the staff of the fire department to 110 employees, below the then contractual mandate of 117, thereby reducing expenditures by $400,000 to $500,000 annually. The City also replaced firefighters who had been serving as dispatchers with lesser paid municipal employees, resulting in an annual savings of over $1 million in fiscal years 2016, 2017, and 2018.

The five year plan also reformed the City's health benefit plans, which accounted for approximately 13 percent of the City's overall budget in fiscal year 2012. Before the five year plan went into effect, the City had administered nineteen different health care plans for employees and retirees, which contained a wide range of benefits and employee contributions. As part of the five year plan, the WBC chose a single uniform plan for all city employees and retirees (the Uniform Plan). The Uniform Plan required point of delivery charges for certain services and prescription drugs, also known as "co-pays," and payment of a deductible for other services, up to an annual maximum of $500 under an individual plan and $1,000 for a family plan. According to the City, the Uniform Plan provided the same or better access to a national network of health care providers than had been provided previously.

From September 2012 through November 2013, the WBC negotiated and secured concessions, including health care concessions, from all seven of the City's bargaining units.[5] From that point forward, all employees were required to contribute to the cost of their health care coverage by making a monthly co-share payment. The City saved, from employee health care reform alone, $1,149,172 for fiscal year 2014; $1,369,294 for fiscal year 2015; $1,538,464 for fiscal year 2016; and $1,707,332 for fiscal year 2017.

---

[5] With respect to the police and firefighter unions, the WBC implemented changes through resolution, and the City represents that those terms were eventually integrated into their respective collective bargaining agreements.

The WBC then went one step further and modified the health care coverage of the retirees. The plaintiffs are former Woonsocket police officers who retired before the WBC was appointed. While they were working, plaintiffs had been represented by the International Brotherhood of Police Officers Local 404 (the union), which negotiated salaries and retirement benefits on their behalf. Over the years, the City and the union had entered into numerous collective bargaining agreements, but the last collective bargaining agreement that had been agreed upon between the City and the union before the WBC was appointed was in effect from July 1, 2002, through June 30, 2005 (the 2002-2005 CBA). Significantly, the 2002-2005 CBA provided the following:

> "4.2 The City shall pay the entire cost of Major medical, plus student rider coverage, and $2 Co-Pay Drug Program, for all members of the IBPO Local 404 on active service in City employment *and including those members placed on disability or retirement pension after July 1, 1981*.
>
> "* * *
>
> "4.5 *The City shall pay the entire cost, including family coverage*, applicable where an employee has a family within Blue Cross definition, *for an employee, covered by this Agreement, placed on disability or retirement pension list after July 1, 1981* and the semi-private plan of the Rhode Island Hospital Service Corporation (Blue Cross) and also the Rhode Island Medical Society Physicians, Service Plan 100 in accordance with the rules and regulations of such corporation. *The City shall pay the cost of Major Medical for said retirees.* Said coverage may be temporarily suspended by the City in avoidance of dual coverage if equal or greater benefits are provided through any other means to said retiree." (Emphasis added.)

From the expiration of the 2002-2005 CBA until 2010, the relevant portions of the 2002-2005 CBA were incorporated by binding interest arbitration awards pursuant to the Municipal Police

Arbitration Act, G.L. 1956 chapter 9.2 of title 28.[6]  In 2010, the union and the City came to a tentative agreement whereby, effective August 15, 2010, any police officer hired after that date would be required to contribute to the cost of his or her health insurance.  The tentative agreement also provided that, when police officers who are hired after August 15, 2010 retire, they would continue to be required to contribute to their health insurance costs.  The tentative agreement was ratified by the Woonsocket City Council in September 2010 and expired on June 30, 2012.

On March 19, 2013, the WBC adopted a resolution, which stated, in pertinent part:

> "Absent agreement to the contrary between the Budget Commission and retiree representatives, all health insurance benefits currently provided to retirees of the City * * * and their beneficiaries, who are not yet eligible or who are ineligible for Medicare benefits shall change, effective July 1, 2013, to [the Uniform Plan] for all City employees and retirees and their beneficiaries, other than those eligible for Medicare, and the City shall cover eighty percent (80%) of the cost, and the retiree, twenty (20%) of the cost of such [Uniform Plan] * * *."

That resolution was amended in June 2013.  The amendment afforded all retirees the option to join an alternative health care plan with a reduced co-share (10 percent) but a higher deductible ($2,000 for the individual plan, $4,000 for the family plan) than the Uniform Plan (the Alternative Plan).  The resolution was amended again in July 2013 and December 2014 to give effect to negotiated agreements with fire and police retirees.[7]  Those resolutions reduced the co-share requirements of the Uniform Plan and Alternative Plan from 20 and 10 percent, respectively, to zero percent by fiscal year 2018.  In other words, effective July 1, 2017, and thereafter, no police or fire retiree, including plaintiffs, would be required to make any co-share

---

[6] Hereafter, all collective bargaining agreements and interest arbitration awards will collectively be referred to as "the CBAs."
[7] Hereafter, the resolution adopted on March 19, 2013, and all amendments that follow will collectively be referred to as "the Retiree Resolutions."

contribution. Through these changes alone, the City saved $2.3 million in fiscal year 2014. Approximately half of those savings came from changes to the police retirees' health care coverage.

Additionally, the WBC, in the Retiree Resolutions, suspended all cost of living adjustments (COLAs) on pension benefits provided to the police and fire retirees and their beneficiaries who were participants in the City's pension plan.[8] The suspension of COLA benefits, effective July 1, 2013, was projected to save the City $1,515,000 annually for fiscal years 2014 through 2017. The WBC also secured an amendment to the 2002 pension bond enactment that allowed for a period of an additional twenty years for amortization if the pension plan fell below full funding. That action saved the City $5,504,000 each fiscal year from 2014 to 2017. Together, the actions on pension reform lowered the City's projected annual required contribution to $3,465,000 for fiscal years 2014 through 2017, from its previous projected contribution for that time period of $11,615,000.[9]

In total, the five year plan generated an average of approximately $13 million in annual savings for the City from fiscal year 2014 through fiscal year 2017 and, if substance followed form, it was anticipated that the City's cumulative operating deficit would be eliminated by fiscal year 2017. Furthermore, the five year plan assumed that the City would continue to make contributions of more than $3.6 million in fiscal years 2014 through 2017 to pay its other post-employment benefits (OPEB). As of July 1, 2013, the City's unfunded OPEB liability had been

---

[8] According to the City, any firefighter who was hired after July 1, 1985, and any police officer hired after July 1, 1980, participated in the Municipal Employees Retirement System (MERS) and was not affected by this action.

[9] The annual contribution was projected to rise, however, to $3,925,000 starting in fiscal year 2018.

$224,446,589, the most of any municipality in the state. By following the five year plan, however, the City would be able to reduce that deficit to $117,549,866.

It is the City's position that the $2.3 million savings from altering the retiree health care benefit plans was necessary, and removing it from the five year plan would have "risked disruption of the delicate balance, and the collapse of the comprehensive effort." It cites for support the trial testimony of the Director of the Rhode Island Department of Revenue, Rosemary Booth Gallogly, who testified at trial as an expert in municipal finance and said that she did not believe there was any other way for the City to have saved $2.3 million other than by altering plaintiffs' health insurance plans.[10]

On July 2, 2013, the day after the City implemented the new health insurance plans for the retirees, plaintiffs filed their complaint in Superior Court, seeking injunctive and declaratory relief. The plaintiffs claimed that the City had contractually promised to pay the entire cost of their health care coverage in accordance with the CBAs that were in effect at the time of their retirement. Preliminary injunction hearings commenced soon thereafter, which entailed ten days of testimony over diverse dates from August 2013 through February 2014. The parties conducted discovery and submitted more than one hundred exhibits and affidavits.

The trial justice heard testimony from Mayor Fontaine, former school committee and city council member John Ward, and Director Gallogly, all of whom testified as to the narrative above. Additionally, six plaintiffs—retired police officers Glen Hebert, Scott Strickland, Ronald Tetreau, Daniel Turgeon, Steven Nowak, and Earl Ledoux—testified at the preliminary injunction hearing that they had retired before the WBC had been appointed and, importantly, with the firm understanding that they would, under the terms of the CBAs in effect at the time of

---

[10] Director Gallogly testified that, in addition to appointing the commission, she attended most of the meetings and was involved in developing the WBC's five year plan.

their respective retirements, receive free health care for the rest of their lives. Mr. Strickland testified that he could not afford to pay the increased costs of the new health care plan, and Mr. Ledoux said that, with the new health care plan in place, his health care costs had increased by approximately $7,000 per year because he and his children were having personal health issues.

In July 2015, approximately one and one-half years after the last preliminary injunction hearing date, and while the decision on the preliminary injunction was still pending, plaintiffs moved to restrain the termination of their health care benefits. The plaintiffs claimed that the City threatened to terminate plaintiffs' health care benefits because they had not paid any co-share contributions. The trial justice ordered that only those plaintiffs who were receiving disability pensions or those who were earning less than 300 percent of the federal poverty level would be absolved from paying any co-shares or deductibles until a final decision was issued. According to the City, seven plaintiffs fell under this classification and were thus exempt from paying their health care insurance.

Approximately two years after the preliminary injunction hearings, in February 2016, the trial justice rendered a decision in this difficult case, and granted plaintiffs' motion for a preliminary injunction.[11] He found that the City and plaintiffs entered into multiple contracts in

---

[11] We note that the trial justice did not "order the trial of the action on the merits to be advanced and consolidated with the hearing of the application" for a preliminary injunction, as provided under Rule 65(a)(2) of the Superior Court Rules of Civil Procedure. "The decision whether or not to consolidate the hearing for preliminary relief with a trial on the merits is left to the sound discretion of the trial justice who may order consolidation and advancement in any appropriate manner as long as his [or her] order protects the parties' rights to a full hearing on the merits." *Richards v. Halder*, 853 A.2d 1206, 1211 (R.I. 2004) (brackets omitted) (quoting *Oster v. Restrepo*, 448 A.2d 1268, 1270 (R.I. 1982)). Importantly, "[t]he parties are not prejudiced if they have received adequate notice and sufficient time to prepare for consolidation and advancement." *Id.* It is our opinion that a trial on the merits should have been advanced and consolidated with the hearing on the motion for a preliminary injunction in accordance with Rule 65(a)(2). Nonetheless, the parties have agreed that, because a final judgment has been entered, this Court should treat the preliminary injunction as a permanent injunction. We agree. *See*

which the City promised to pay for all of plaintiffs' health insurance and that of their dependents. According to the trial justice, many police officers, including those who testified, "retired based on the contracts' assurances of continued coverage." He determined that the City was not vested with the statutory authority under the FSA to alter plaintiffs' health care benefits. He further found that the City had violated the Contract Clause of the Rhode Island Constitution.[12] Specifically, the trial justice held that the City's alterations to the health insurance benefits provisions constituted a substantial impairment to plaintiffs' existing contracts. Although the trial justice found that the City had demonstrated that it was in a precarious financial condition when the contractual promises were modified, he also held that "the situation was not necessarily dire" because "[t]he City could not demonstrate that it was on the verge of bankruptcy" and "[a] receiver had not been appointed." The court reasoned that "[t]he deprivations to the retirees were too broad and too deep to render them of a character appropriate to the public purpose." As a result, the trial justice determined that plaintiffs had successfully proven a likelihood of success on the merits of their Contract Clause claim.

The trial justice further found that injunctive relief was necessary to prevent irreparable harm to plaintiffs because they had "demonstrated that their access to necessary health care [was] threatened by Defendants' modification of their health care benefits[.]" He also held that the equities favored plaintiffs because the City had participated in the creation of its own fiscal

_____

*Gregory v. State Department of Mental Health, Retardation and Hospitals*, 495 A.2d 997, 998 n.1 (R.I. 1985) ("Although the trial justice granted a preliminary injunction, the parties have stipulated that the ruling shall be considered as a permanent injunction for purposes of our review."). By treating the trial justice's decision as the granting of a permanent injunction, we may now "resolve the underlying substantive issues" as we normally would "after the imposition of a permanent injunction." *Gianfrancesco v. A.R. Bilodeau, Inc.*, 112 A.3d 703, 708 (R.I. 2015) (quoting *Vasquez v. Sportsman's Inn, Inc.*, 57 A.3d 313, 318 (R.I. 2012)).
[12] The record reflects that plaintiffs did not pursue a Contract Clause claim under the United States Constitution.

disaster, had failed to take timely measures to improve its finances, and now wished to make permanent changes to plaintiffs' existing contracts without the benefit of negotiation. Finally, the trial justice found that preserving the status quo would necessitate granting the preliminary injunction and requiring the City to pay for plaintiffs' health care benefits. He thus reinstated the postretirement health care benefits as they had been enumerated in the 2002-2005 CBA.[13] The City filed a timely notice of appeal.[14]

## II

### Standard of Review

"This Court will reverse the decision of a trial justice to grant or deny a permanent injunction only when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong." *Pelletier v. Laureanno*, 46 A.3d 28, 35 (R.I. 2012) (quoting *Hilley v. Lawrence*, 972 A.2d 643, 648 (R.I. 2009)). "This Court's review of the factual findings of a trial justice sitting without a jury is deferential." *Id.* (quoting *Hilley*, 972 A.2d at 648). "We likewise accord great deference to the trial justice's 'resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence' in a nonjury case." *Id.* (quoting *Nye v. Brousseau*, 992 A.2d 1002, 1008 (R.I. 2010)). We do, however, "apply a *de novo* review to pure questions of law that are raised on appeal." *Id.*

---

[13] After the trial justice rendered his decision, he granted a stay of the ruling for a limited period of time. The City then filed a motion for a stay in this Court, and this Court implemented a stay, exempting seven plaintiffs from having to pay for their health care insurance but requiring the remaining plaintiffs to continue all payments.

[14] Following the prebriefing conference, this Court remanded the case to the Superior Court for entry of final judgment. In January 2017, on remand in the Superior Court, and in accordance with Rule 58(c) of the Superior Court Rules of Civil Procedure, a final judgment entered in favor of plaintiffs on their amended complaint for injunctive and declaratory relief for the reasons set forth in the trial justice's February 2016 decision.

**Discussion**

"A party seeking injunctive relief must demonstrate that it stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore that plaintiff to its rightful position." *Nye*, 992 A.2d at 1010 (quoting *National Lumber & Building Materials Co. v. Langevin*, 798 A.2d 429, 434 (R.I. 2002)). "Irreparable injury must be either presently threatened or imminent; injuries that are prospective only and might never occur cannot form the basis of a permanent injunction." *Id.* (quoting *National Lumber & Building Materials Co.*, 798 A.2d at 434). "A party seeking an injunction must also demonstrate likely success on the merits and show that the public-interest equities weigh in favor of the injunction." *National Lumber & Building Materials Co.*, 798 A.2d at 434.

On appeal, the City argues that the trial justice erred in finding that plaintiffs had a vested contractual right to lifetime health benefits, virtually without cost, for themselves and their beneficiaries. Moreover, the City contends that the WBC had the statutory authority under the FSA to make changes to plaintiffs' health care benefits. The City further alleges that plaintiffs failed to prove that the City violated their rights under the Contract Clause of the Rhode Island Constitution by changing their health care plans and requiring all retirees to contribute to the cost of their health insurance. Because the trial justice grouped all of those findings under the "likelihood of success on the merits" element of an injunction, we will focus our analysis on that prong.

## A

### Vested Contractual Right to Free Lifetime Health Benefits

The City first argues that the trial justice erred when he held that plaintiffs had a vested right to immutable lifetime health care benefits, at no cost, by way of the CBAs that had been negotiated on their behalf with the City. The City claims that such a right could not vest because the CBAs relied on by plaintiffs were, in fact, void *ab initio*.[15]

We held in *Arena v. City of Providence*, 919 A.2d 379 (R.I. 2007), that "'the right to deferred compensation vests upon meeting the terms of employment, but that vesting is subject to divestment because it is conditioned on continued honorable and faithful service.' Therefore, in Rhode Island, pension benefits vest once an employee honorably and faithfully meets the applicable pension statute's requirements." *Arena*, 919 A.2d at 393 (brackets omitted) (quoting *In re Almeida*, 611 A.2d 1375, 1386 (R.I. 1992)). In *Arena*, the source of the plaintiffs' retirement benefits was not a collective bargaining agreement because there had been no agreement in existence at the time the plaintiffs retired. *Id.* at 391. The plaintiffs argued, unsuccessfully, that the terms of the collective bargaining agreement that had expired the year prior to their retirement should govern the gap between the prior agreement's expiration and the effective date of the following collective bargaining agreement. *Id.* Instead, we held that the controlling authority was a municipal ordinance which was enacted to provide retroactive retirement benefits for employees who had retired during the gap between effective collective bargaining agreements. *Id.* at 393. Significantly, that ordinance had been amended in the years

---

[15] With all due respect to our concurring colleagues, we believe that this issue should be addressed. The issue was raised before the trial justice and should have been decided at trial. It is the primary issue raised by the City on appeal, and the City has thoroughly briefed and argued the matter. Because the viability of the contract provisions in dispute is an issue which is legal in nature, we believe that we can and should decide it here and now and there is no need to remand it to the Superior Court.

since the plaintiffs' retirement. *Id.* The Court nevertheless held that "a court must look to a retirement plan's provisions at the time an employee retires to ascertain whether he or she is entitled to a benefit." *Id.* at 395; *see Board of Trustees of the Sheet Metal Workers' National Pension Fund v. Commissioner of Internal Revenue*, 318 F.3d 599, 604, 605 (4th Cir. 2003).

Therefore, in the case before us now, we must look to the CBAs in existence at the time of plaintiffs' retirement to determine what rights they were entitled to under the agreements. The City maintains, however, that those agreements cannot be the source of the health care rights sought by plaintiffs because those agreements were void *ab initio*. In reaching that conclusion, the City relies on the well settled principle in this state that "any contract made by a governmental authority involving the performance of a governmental function that extends beyond the unexpired terms of the governmental officials executing the contract is void because such an agreement improperly ties the hands of subsequent officials." *Rhode Island Student Loan Authority v. NELS, Inc.*, 550 A.2d 624, 626 (R.I. 1988); *see Parent v. Woonsocket Housing Authority*, 87 R.I. 444, 447, 143 A.2d 146, 147 (1958) ("[L]egislative bodies and municipal agencies having legislative powers may not by contract impair or prevent a succeeding body or agency from exercising a legislative or governmental function."). The City argues that the CBAs in question related to the performance of police officers' authority to enforce the laws of this state, and therefore "involv[ed] the performance of a governmental function[.]" *NELS, Inc.*, 550 A.2d at 626. The City further argues that, to the extent that those CBAs were effective for a period extending past the unexpired terms of the members of the Woonsocket City Council, the CBAs "tie[d] the hands of subsequent officials" and were thus void. *Id.*

Before we grapple with this difficult question, we believe it wise to define certain terms. A "governmental function" is "a function so intertwined with governing that the government is

obligated to perform it only by its own agents or employees."[16] *Xavier v. Cianci*, 479 A.2d 1179, 1182 (R.I. 1984). Governmental functions typically "involve[] a high degree of discretion such as governmental planning or political decision making." *Roach v. State*, 157 A.3d 1042, 1051 (R.I. 2017) (quoting *Catone v. Medberry*, 555 A.2d 328, 333 (R.I. 1989)). In contrast, "'[p]roprietary' functions are those 'actions normally performed by private individuals.'" *Roach*, 157 A.3d at 1052 (quoting *Graff v. Motta*, 695 A.2d 486, 489 (R.I. 1997)). Indeed, proprietary functions are essentially the inverse of governmental functions, and this Court has defined them as such, saying that "a 'proprietary function' [is] 'one which is not so intertwined with governing that the government is obligated to perform it only by its own agents or employees.'" *Id.* (quoting *Lepore v. Rhode Island Public Transit Authority*, 524 A.2d 574, 575 (R.I. 1987)).

The distinction between governmental functions and proprietary functions is important to the case before us because, as we have noted *supra*, "any contract made by a governmental authority involving the performance of a governmental function that extends beyond the unexpired terms of the governmental officials executing the contract is void because such an agreement improperly ties the hands of subsequent officials." *NELS, Inc.*, 550 A.2d at 626. On the other hand, "if the contract merely involves a proprietary function of a governmental body, its validity is upheld and may bind successors for as long a period as is necessary to accomplish the contract's goal." *Id.* Therefore, if we determine that the CBA provisions that provided health care benefits to plaintiffs were executed in furtherance of a governmental function and that they "extend[ed] beyond the unexpired terms of the governmental officials executing the contract[s,]"

---

[16] Determining whether a governmental function exists also can be critical when examining the public duty doctrine, which "immunizes the state from 'tort liability arising out of discretionary governmental actions that by their nature are not ordinarily performed by private persons.'" *Roach v. State*, 157 A.3d 1042, 1050 (R.I. 2017) (brackets omitted) (quoting *Morales v. Town of Johnston*, 895 A.2d 721, 730 (R.I. 2006)).

then the CBAs would be void, as would be any and all benefits that those contracts purported to confer, including but not limited to the health care benefits at issue in this case. *Id.* On the other hand, if we determine that the CBAs were executed in furtherance of a proprietary function, then we will uphold them so long as those contracts lasted no longer than was "necessary to accomplish the contract's goal." *Id.*

We have recognized "the somewhat murky nature of deciphering when the state executes a proprietary versus a governmental function." *Roach*, 157 A.3d at 1053. That miasma thickens further when we consider that "a governmental entity can exercise both governmental and proprietary functions." *NELS, Inc.*, 550 A.2d at 627. That said, however "murky" the distinction, "[i]n both inquiries, this Court pinpoints the function at issue and examines whether it is so significantly tied to governing that private persons or entities could not possibly fulfill it." *Roach*, 157 A.3d at 1053.

In *Parent*, we considered a contract between the Woonsocket Housing Authority and an attorney named Parent, whereby Parent "agreed to perform 'all and necessary legal services for a period of five years[.]'" *Parent*, 87 R.I. at 447, 143 A.2d at 147 (deletion omitted). Unfortunately for Parent, that five year term extended beyond the terms of some members of the housing authority, whose terms of office were staggered so that one member stepped down and a new member was added to the authority every year. *Id.* at 446, 143 A.2d at 146. After determining that the housing authority had "a dual nature which partakes of a public as well as a private character[,]" we held that Parent had been employed to carry out a governmental function because the housing authority depended on him to carry out some of its many duties which were governmental in character, such as the exercise of its investigatory power and its power of eminent domain. *Id.* at 448, 449, 143 A.2d at 148.

- 20 -

In contrast, we found the contract at issue in *NELS* to have been executed in furtherance of a proprietary function. *NELS, Inc.*, 550 A.2d at 627. As we explained in that case, the Rhode Island Student Loan Authority (RISLA) was created by the General Assembly to purchase federal and state guaranteed student loans from lenders, thereby increasing the cash available to those lenders with which lenders could make additional student loans. *Id.* at 625. RISLA's management was vested in a board of five members, appointed by the governor, whose terms of office were staggered. *Id.*

The defendant, NELS, Inc., entered into an agreement with RISLA in 1984, under the terms of which NELS agreed to service student loans that the loan authority had purchased, for a fifteen year period, the usual length of time it took to pay off a student loan in that decade, beginning in 1984. *NELS, Inc.*, 550 A.2d at 625-26. That fifteen year period necessarily exceeded the five year terms of RISLA's board members and, for one reason or another, RISLA filed a declaratory judgment action seeking a declaration that the servicing agreement was void, on the basis that governmental authorities cannot enter into contracts for the performance of a governmental function that bind the hands of subsequent officials. *Id.* at 626. RISLA's argument was based on "the Legislature's description of the powers conferred upon RISLA as 'a performance of an essential governmental function of the state for public purposes.'" *Id.* at 626-27 (brackets omitted). We determined, however, that "such a determination is reserved by our State Constitution for the judicial, rather than the legislative, branch of government." *Id.* at 627. We further held that "the particular facet of RISLA's operations that NELS covers is clearly proprietary." *Id.* Significantly, we determined that NELS "could neither exercise discretion nor set policy in the performance of its duties." *Id.*

Having determined that NELS was performing a proprietary function, we had only to decide "whether the contract binds RISLA for a period of time longer than necessary to accomplish its purposes." *See NELS, Inc.*, 550 A.2d at 627. We held that the servicing agreement's duration was proper because the contract "extend[ed] no longer than the usual time span for which a student loan is outstanding[.]" *Id.*

In our opinion, it is clear that the CBAs at issue in the case before us now are closer in kind to the agreement at issue in *NELS* than to the employment contract in *Parent*. In *Parent*, the employment contract at issue authorized Parent to assist in the performance of duties that were clearly governmental in nature, such as the exercise of the housing authority's investigatory power and its power of eminent domain. *Parent*, 87 R.I. at 449, 143 A.2d at 148. That contract necessarily empowered Parent to exercise a certain amount of discretion in how to carry out his duties, and it was impermissible to afford Parent that discretion beyond the terms of those members of the board who had deemed it advisable to hire him. *See id.*

We find no such grant of authority in the CBAs before us. The fact that the CBAs relate to the employment of police officers by a municipality is not dispositive. We must examine the contracts before us, as a whole, to "pinpoint[] the function at issue and examine[] whether it is so significantly tied to governing that private persons or entities could not possibly fulfill it." *Roach*, 157 A.3d at 1053. Having examined the CBAs before us, it is clear that the function at issue does not "involve[] a high degree of discretion such as governmental planning or political decision making." *Id.* at 1051 (quoting *Catone*, 555 A.2d at 333). At issue in the CBAs before us are the benefits packages, providing contractual rights to health care and other benefits that have been negotiated for by the police unions with the City of Woonsocket. They have nothing to do with the manner in which the City or the police enforce the law. It cannot be disputed that

- 22 -

private companies also routinely enter into agreements for the provision of employee benefits. Such bargaining, and the resulting contract, is thus an "action[] normally performed by private individuals."[17] *Id.* at 1052 (quoting *Graff*, 695 A.2d at 489). We thus hold that the provision of health care benefits to retirees in the CBAs before us is a function that is proprietary in nature.

That being said, we must also determine whether the contracts at issue lasted no longer than was "necessary to accomplish the contract[s'] goal[s]." *NELS, Inc.*, 550 A.2d at 626. All of the CBAs at issue in this case were in effect for various periods of no more than three years. That three year period is typical for collective bargaining agreements of this type, and, because of that short duration, frequent renegotiations occurred between the bargaining unit and the City of Woonsocket.[18] *See* § 28-9.2-6 (requiring that collective bargaining agreements between a city and a police bargaining agent not exceed a term of three years). The provision did not bind the City for a period of time longer than necessary to accomplish its purpose, which was to settle labor relations for a three year period. *See id.* Therefore, we are of the opinion that the provisions of the CBAs at issue were valid and that plaintiffs' rights to the postretirement health care benefits had vested.

---

[17] To be clear, our decision today is based on the provisions of the CBAs actually before us in this case. It is conceivable that other collective bargaining agreements might provide for the exercise of governmental functions or might extend beyond the time period necessary to accomplish the agreements' purposes. When conducting our inquiry into the governmental or proprietary nature of a contract, our review is limited to the contents of the contract or contracts actually before us, and it is from there that the Court "pinpoints the function at issue and examines whether it is so significantly tied to governing that private persons or entities could not possibly fulfill it." *Roach*, 157 A.3d at 1053.

[18] We note that the focus of our inquiry is on the length of time the contracts were in effect, and not on the length of the benefits provided for in the contracts. Retirement benefits are often, by their nature, lifetime benefits, and the contours of those benefits are subject to give and take negotiations every three years. That is the period provided for in G.L. 1956 § 28-9.2-6, and we do not believe that period to be unreasonable.

## B

### Statutory Authority under the Fiscal Stability Act

The City next argues that the trial justice erred when he found that the WBC lacked statutory authority when it adopted the Retiree Resolutions that required plaintiffs to contribute to their health care expenses. The trial justice determined that "[t]here was no specific power given in the broadly worded § 45-9-9 or § 45-9-6 to unilaterally alter existing contracts or to alter contract rights given to retired employees." However, the City contends that the statute's plain and unambiguous language provides the WBC with necessarily broad and expansive powers and that the statute did not limit the WBC's authority to adopt the Retiree Resolutions.

"We review questions of statutory interpretation *de novo*." *Mello v. Killeavy*, 205 A.3d 454, 459 (R.I. 2019) (quoting *State v. Hazard*, 68 A.3d 479, 485 (R.I. 2013)). "[I]t is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Powers v. Warwick Public Schools*, 204 A.3d 1078, 1086 (R.I. 2019) (quoting *Whittemore v. Thompson*, 139 A.3d 530, 540 (R.I. 2016)). "If we find the statute or rule to be unambiguous, we simply apply the plain meaning and our interpretive task is done." *State v. Morais*, 203 A.3d 1150, 1154 (R.I. 2019) (quoting *Cashman Equipment Corporation, Inc. v. Cardi Corporation, Inc.*, 139 A.3d 379, 382 (R.I. 2016)). With that in mind, "it is well settled that the plain statutory language is the best indicator of the General Assembly's intent." *Twenty Eleven, LLC v. Botelho*, 127 A.3d 897, 900 (R.I. 2015) (brackets omitted) (quoting *Zambarano v. Retirement Board of Employees' Retirement System of Rhode Island*, 61 A.3d 432, 436 (R.I. 2013)). "Only when a statute is ambiguous do we 'apply the rules of statutory construction and examine the statute in its entirety

to determine the intent and purpose of the Legislature.'" *State v. Paiva*, 200 A.3d 665, 667 (R.I. 2019) (quoting *State v. Diamante*, 83 A.3d 546, 548 (R.I. 2014)).

It is significant that the FSA was enacted after the equally financially distressed City of Central Falls requested a judicial receivership so it could file for Chapter 9 bankruptcy pursuant to Title 11 of the United States Code. *See Moreau v. Flanders*, 15 A.3d 565, 570 (R.I. 2011). However, rating agencies informed state officials at that time that, should a receivership occur, capital markets would view debt financing to other Rhode Island cities and towns as extremely risky, which would in turn raise the price of such financing for all Rhode Island municipalities. *Id.* at 571. As a result, the General Assembly enacted the FSA "for the purpose of creating a more effective mechanism to identify and respond to dire financial adversity confronting municipalities." *Id.* Of note, § 45-9-1 of the FSA sets forth the following:

> "**Declaration of policy and legal standard.** It shall be the policy of the state to provide a mechanism for the state to work with cities, towns, and fire districts undergoing financial distress that threatens the fiscal well-being, public safety, and welfare of such cities, towns, and fire districts or other cities, towns, fire districts or the state, with the state providing varying levels of support and control depending on the circumstances. The powers delegated by the general assembly in this chapter shall be carried out having due regard for the needs of the citizens of the state and of the city, town, or fire district and in such a manner as will best preserve the safety and welfare of citizens of the state and their property and the access of the state, its municipalities, and fire districts to capital markets, all to the public benefit and good."

As a means to "restore stability to a fiscally imperiled city or town[,]" the FSA provides "a tiered system of oversight, including appointments of a fiscal overseer, a budget and review commission, and finally a nonjudicial receiver."[19] *Moreau*, 15 A.3d at 569.

---

[19] The trial justice in the present case indicated that a fiscal overseer was appointed in May 2012, but that the fiscal overseer was "unable to achieve fiscal stability, [and] requested the appointment of a Budget Commission." However, after scouring the record, it appears that a

In our view, the language in § 45-9-6 is clear and unambiguous. Under that statute, a budget commission, comprised of five members, is tasked to "initiate and ensure the implementation of appropriate measures to secure the financial stability of the city, town, or fire district."[20] Section 45-9-6(a). Significantly, the FSA grants "broad and encompassing" powers to the budget commission, *see Moreau*, 15 A.3d at 577, such as approving all appropriations, borrowing authorizations, and transfers; amending, formulating, and executing budgets; implementing and maintaining budget guidelines for departments; amortizing deficits; approving or disapproving all proposed contracts for goods and services; appointing, removing, supervising, and controlling all city or town employees; altering or eliminating the compensation and benefits of elected officials; increasing fees, charges, and rates for municipal services and activities; and reorganizing, consolidating, or abolishing departments. Section 45-9-6(c) and (d).

Although the trial justice was correct in finding that § 45-9-6 does not specifically enumerate a discrete right to unilaterally alter benefits founded in contract rights, that finding is not determinative. As mentioned above, "the plain statutory language is the best indicator of the General Assembly's intent." *Twenty Eleven, LLC*, 127 A.3d at 900 (quoting *Zambarano*, 61 A.3d at 436). Moreover, when the General Assembly enacted the FSA, it specifically directed courts to liberally construe the already sweeping textual provisions of the FSA to effectuate its purposes of ensuring the necessity "for the welfare of the state and its inhabitants[.]" Section 45-9-16. There is no express limitation presented in § 45-9-6 that would prohibit the WBC from altering

_____

fiscal overseer never had been requested or appointed. Instead, the city council and the mayor first requested the appointment of a budget commission, which request was granted by the Director of the Department of Revenue.

[20] Moreover, the FSA specifies that "[a]ction by the budget commission under this chapter shall constitute action by the city, town, or fire district for all purposes under the general laws, under any special law, and under the city, town, or fire district charter." General Laws 1956 § 45-9-6(b). In other words, if the city or town is empowered to commit an action, the budget commission is likewise empowered.

rights arising from expired CBAs or interest arbitration awards to require plaintiffs to contribute to the cost of their health care benefits. Therefore, because § 45-9-6 is clear and unambiguous, is to be liberally construed as required by the General Assembly, grants expansive powers to the WBC, and does not provide an express limitation to alter plaintiffs' rights to free lifetime health care benefits, it is our opinion that the WBC was authorized, under § 45-9-6, to adopt the Retiree Resolutions.

That said, § 45-9-9, on the other hand, does contain a specific and express limitation on a budget commission's authority with respect to collective bargaining agreements. We are of the opinion that, like § 45-9-6, § 45-9-9 is clear and unambiguous. That statute provides the following:

> "**Collective bargaining agreements.** Notwithstanding chapter 7 of title 28 or any other general or special law or any charter or local ordinance to the contrary, new collective bargaining agreements, and any amendments, to new or existing collective bargaining agreements, (collectively, 'collective bargaining agreements') entered into by the city, town, or fire district or the school department, shall be subject to the approval of the * * * budget commission * * * if the * * * budget commission * * * is in effect at the time. No collective bargaining agreement shall be approved under this section unless the * * * budget commission * * * has participated in the negotiation of the collective bargaining agreement and provides written certification to the director of revenue that after an evaluation of all pertinent financial information reasonably available, the city's, town's, or fire district's financial resources and revenues are, and will continue to be, adequate to support such collective bargaining agreement without a detrimental impact on the provision of municipal or fire district services. * * * *This section shall not be construed to authorize a fiscal overseer, a budget commission, or a receiver under this chapter to reject or alter any existing collective bargaining agreement, unless by agreement, during the term of such collective bargaining agreement.*" (Emphasis added.)

We conclude that the limitation of the WBC's powers under § 45-9-9 is inapplicable to the case at bar. The CBAs that granted plaintiffs the right to free lifetime health care benefits for

themselves and their beneficiaries expired considerably before the Retiree Resolutions went into effect in 2013. Even more important, however, § 45-9-9 mandates that the WBC does not have the authority to "reject or alter any *existing* collective bargaining agreement, unless by agreement, *during the term of such collective bargaining agreement*." (Emphasis added.) It follows that, although plaintiffs' retirement rights were, and continue to be, derived from the CBAs that were in existence when they retired, *see Arena*, 919 A.2d at 395, those agreements and awards had long expired when the WBC modified the health care benefits that were part of those CBAs and awards. For the foregoing reasons, we hold that nothing in either § 45-9-6 or § 45-9-9 serves as a bar for the WBC to adopt the Retiree Resolutions.

## C

### Contract Clause

In addition to arguing that it did not violate the Contract Clause of the Rhode Island Constitution when it altered plaintiffs' rights to free lifetime health care benefits by adopting the Retiree Resolutions, the City contends that the Superior Court, in conducting its Contract Clause analysis, erroneously placed the burden of proof on the City to prove that there was not a Contract Clause violation.[21] The City argues that, at the very least, the trial justice should have adopted a burden-shifting analysis as implemented by the lower court, and subsequently affirmed by this Court in *Cranston Police Retirees Action Committee v. City of Cranston*, -- A.3d --, No. 2017-36-Appeal, 2019 WL 2332508 (R.I. June 3, 2019) (*Cranston*).

At the outset, we "will apply a *de novo* standard of review to questions of law that may implicate a constitutional right." *Goetz v. LUVRAJ, LLC*, 986 A.2d 1012, 1016 (R.I. 2010). On the other hand, we refuse to disturb the findings of fact made by a trial justice sitting without a

---

[21] Article 1 of the Rhode Island Constitution prevents the passage of laws "impairing the obligation of contracts[.]" R.I. Const. art. 1, § 12.

jury "unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence." *Gregoire v. Baird Properties, LLC*, 138 A.3d 182, 191 (R.I. 2016) (deletion omitted) (quoting *South County Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 210 (R.I. 2015)). "When the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his or hers even though a contrary conclusion could have been reached." *Id.* (brackets omitted) (quoting *South County Post & Beam, Inc.*, 116 A.3d at 210). Significantly, however, "[w]e review the trial justice's determination and application of the burden-shifting analysis *de novo*." *Cranston*, -- A.3d at --, 2019 WL 2332508, at *7. Furthermore, "it would be reversible error for a trial justice to apply the wrong burden of proof." *Id.* (quoting *Panarello v. State Department of Corrections*, 88 A.3d 350, 366 (R.I. 2014)).

This Court has adopted the United States Supreme Court's three-part analysis for Contract Clause claims. *See Nonnenmacher v. City of Warwick*, 722 A.2d 1199, 1202 (R.I. 1999) (citing *General Motors Corporation v. Romein*, 503 U.S. 181, 186 (1992)). "A court first must determine whether a contract exists." *Cranston*, -- A.3d at --, 2019 WL 2332508, at *6 (quoting *Nonnenmacher*, 722 A.2d at 1202). "Second, 'if a contract exists, the court then must determine whether the modification results in an impairment of that contract and, if so, whether this impairment can be characterized as substantial.'" *Id.* (brackets omitted) (quoting *Nonnenmacher*, 722 A.2d at 1202). "Finally, if it is determined that the impairment is substantial, the court then must inquire whether the impairment, nonetheless, is reasonable and necessary to fulfill an important public purpose." *Id.* (quoting *Nonnenmacher*, 722 A.2d at 1202).

In *Cranston*, the plaintiff, a nonprofit organization consisting of retired Cranston police officers, filed suit against the City of Cranston after the city, immersed in dire financial straits,

passed two ordinances in 2013 resulting in a ten year suspension of COLA benefits for retired members of the Cranston police and fire departments. *Cranston*, -- A.3d at --, 2019 WL 2332508, at *2, *4. The plaintiff alleged, *inter alia*, that the ordinances violated the Contract Clauses of the United States and Rhode Island Constitutions.[22] *Id.* at -- n.4, 2019 WL 2332508, at *3 n.4. Before trial began, the trial justice determined that a burden-shifting analysis would be employed to determine whether there had been a Contract Clause violation. *Id.* at --, 2019 WL 2332508, at *3. Specifically, the trial justice set out the following:

> "(1) '[p]laintiff bears the burden of production in establishing [whether the state law has substantially impaired a contract] beyond a reasonable doubt'; (2) if plaintiff meets that burden, 'the burden of production shifts to the defendant to prove' that the 2013 ordinances were reasonable and necessary to fulfill a significant and legitimate public purpose; and (3) '[t]hereafter, a plaintiff may, of course, rebut with evidence that the legislation was not reasonable and necessary * * * beyond a reasonable doubt.'" *Id.* at --, 2019 WL 2332508, at *6.

The trial justice in *Cranston* also determined that the city would only be required to produce credible evidence that would demonstrate that the substantial impairment was reasonable and necessary to support a legitimate public purpose. *Id.* The court also determined that it would use "a 'less deference' standard" in determining whether the ordinance was reasonable and necessary. *Id.* After a five day trial, the Superior Court in *Cranston* found that the city had not violated the Contract Clauses of the United States or Rhode Island Constitutions when it enacted the 2013 ordinances. *Id.* at --, 2019 WL 2332508, at *4, *5.

On appeal, the plaintiff in *Cranston* argued that the trial justice erred by incorporating a burden-shifting analysis into the Contract Clause analysis. *Cranston*, -- A.3d at --, 2019 WL 2332508, at *5. We first noted that "'[t]he burden of persuasion refers to the litigants' burden of

---

[22] As mentioned in footnote 12, *supra*, in the case before us, plaintiffs have pursued only a Contract Clause claim under the Rhode Island Constitution.

establishing the truth of a given proposition in a case by such quantum of evidence as the law may require' and it 'never shifts.'" *Id.* at --, 2019 WL 2332508, at *7 (punctuation omitted). On the other hand, "[t]he burden of production, also referred to as the 'burden of going forward with the evidence,' *DeBlois v. Clark*, 764 A.2d 727, 732 n.3 (R.I. 2001), 'shifts from party to party as the case progresses.'" *Id.* (quoting *Murphy v. O'Neill*, 454 A.2d 248, 250 (R.I. 1983)). After recognizing that there is a split on this issue among federal Circuit Courts of Appeals, our caselaw, and caselaw from the United States Supreme Court with regards to a burden-shifting analysis, and taking note of "the general logic that the [c]ity would have access to the information and motivation to demonstrate its justification for the contractual impairment," we held that the trial justice did not err when she tasked the city with the burden of production with respect to the reasonable-and-necessary element of the Contract Clause analysis. *Id.*

Significantly, this Court also held in that case that the trial justice did not err by requiring the city to proffer only credible evidence of its justifications and by subjecting the city to "a 'less deference' standard." *Cranston*, -- A.3d at --, 2019 WL 2332508, at *8. We reasoned that "a duly enacted ordinance carries with it a presumption of constitutionality which will disappear only on a contrary showing beyond a reasonable doubt." *Id.* (quoting *Town of Glocester v. Olivo's Mobile Home Court, Inc.*, 111 R.I. 120, 124, 300 A.2d 465, 468 (1973)). We recognized, however, that "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *Id.* (quoting *United States Trust Company of New York v. New Jersey*, 431 U.S. 1, 25-26 (1977)). Although we noted that neither this Court nor the United States Supreme Court had yet to determine a "specific quantum of proof" that the city must meet under the reasonable-and-necessary element, we nonetheless emphasized that the "government actor is afforded a limited amount of deference

as to that showing." *Id.* For these reasons, we held that the trial justice's decision to incorporate "a 'less deference' standard" as opposed to a complete deference standard was appropriate.[23] *Id.*

Consistent with our recent holding in *Cranston*, we are of the opinion that here the trial justice erred because he applied the wrong standard and gave no deference to the City. As noted above, after a plaintiff has proven that a contract exists and that a modification results in a substantial impairment of that contract, the burden shifts to the municipality to produce evidence that will demonstrate "whether the impairment, nonetheless, is *reasonable and necessary to fulfill an important public purpose*."[24] *Cranston*, -- A.3d at --, 2019 WL 2332508, at \*6 (emphasis added) (quoting *Nonnenmacher*, 722 A.2d at 1202). Instead of incorporating that burden, however, the trial justice in the present case determined the following:

> "The City demonstrated that it was in a precarious financial condition at the time the Budget Commission modified the contract provisions—*but the situation was not necessarily dire. The City could not demonstrate that it was on the verge of bankruptcy. A receiver had not been appointed*. Rather, remedial efforts had already been enacted by the Budget Commission, the Mayor and the City Council, with ongoing assistance from the state Director of Revenue, which displayed great progress in resolving the City's fiscal issues. The City asserts that avoiding bankruptcy, limiting ongoing expenses, and decreasing liabilities are legitimate public purposes which justify the contract modifications. Of course, such

---

[23] In *Cranston Police Retirees Action Committee v. City of Cranston*, -- A.3d --, No. 2017-36-Appeal, 2019 WL 2332508 (R.I. June 3, 2019), we also held that the trial justice did not fail to shift the burden of production to the city because "it [was] clear that the trial justice required the [c]ity to put forth evidence demonstrating a significant and legitimate public purpose for the 2013 ordinances, and that the 2013 ordinances were reasonable and necessary." *Cranston*, -- A.3d at --, 2019 WL 2332508, at \*8.

[24] It is not clear whether the trial justice placed the burden of proof to prove the first two elements of the Contract Clause analysis on plaintiffs or on the City. Nonetheless, upon reviewing the evidence in the record, we discern no error in the trial justice's determination that contracts existed between plaintiffs and the City that created the rights to free health care benefits, and that there was a substantial impairment of that vested right when the WBC adopted the Retiree Resolutions, which required plaintiffs to contribute to the cost of their health care insurance.

- 32 -

goals are important in any enterprise—public or private—*but they do not always justify reneging on a contract*." (Emphasis added.)

Under this analysis, the City would have been required to prove, not that the substantial impairment was reasonable and necessary to fulfill an important public purpose, but that the circumstances were so "dire" that the City needed to be "on the verge of bankruptcy" and that there was a need for the appointment of a receiver. We are of the opinion that such a standard imposes a stricter burden on the City than the Contract Clause analysis employed by this Court requires, and is also inconsistent with the purpose and procedures set forth in the FSA.[25] *See Moreau*, 15 A.3d at 571.

Moreover, the standard that the trial justice imposed on the City to prove the reasonable-and-necessary element seems not to have accorded any deference to the City. *See Cranston*, -- A.3d at --, 2019 WL 2332508, at *8. Although we are cognizant that the WBC could not enact an ordinance as the city did in *Cranston*, we are nonetheless of the opinion that the FSA grants a budget commission broad powers, *see Moreau*, 15 A.3d at 577, and even provides that "[a]ction by the budget commission under [chapter 9 of title 45] shall constitute action by the city, town, or fire district for all purposes under the general laws, under any special law, and under the city, town, or fire district charter." Section 45-9-6(b). That provision, which allows the WBC to essentially assume the role of the City, along with the FSA's purpose to focus on the needs, safety, and welfare of the citizens of the state and the City, as well as access to capital markets, "all to the public benefit and good[,]" § 45-9-1, makes it clear to this Court that some deference should be accorded to the City when producing evidence on the reasonable-and-necessary

---

[25] Of course, there is no question that the overarching purpose of the FSA is to establish a sophisticated process that will, if possible, avoid receivership and/or bankruptcy. *See* § 45-9-1; *Moreau v. Flanders*, 15 A.3d 565, 571 (R.I. 2011). The record in this case reveals that, in light of the City's improved financial situation, the statutory process has been effective.

element of the Contract Clause analysis. We therefore conclude that, consistent with this Court's opinion in *Cranston*, this matter must be remanded to the lower court for the trial justice to implement a "less deference" standard where the City is required to prove that the substantial impairment to plaintiffs' contractual rights was nonetheless reasonable and necessary to fulfill an important public purpose.

Moreover, although it appears from the record that, commencing July 1, 2017, plaintiffs would no longer be required to make co-share payments for their health insurance, we note that no such abatement has been enacted with respect to plaintiffs' requirement to pay for health insurance deductibles. It has been represented to this Court, and the record supports, that the City, through the herculean efforts of the WBC and municipal officials, is now on the mend financially. We therefore are of the opinion that, if the trial court, giving appropriate deference to the City's actions, determines that the WBC did not violate the Contract Clause, the requirement that plaintiffs pay deductibles on their health insurance should be of a finite and reasonable duration. *See Cranston*, -- A.3d at --, 2019 WL 2332508, at *2 (suspension of COLA was for a period of ten years).[26]

## IV

## Conclusion

For the foregoing reasons, we vacate the judgment of the Superior Court and remand to that court for further proceedings consistent with this opinion. The record shall be returned to the Superior Court.

---

[26] Because we vacate the judgment of the Superior Court on these grounds, we need not, and do not, decide whether the trial justice erred when he determined that plaintiffs had established irreparable harm.

**Chief Justice Suttell, concurring.** I fully concur with the holding of the majority that vacates the judgment of the Superior Court and remands the case to the trial justice for additional findings. I part company with the majority, however, only with respect to the reasoning underlying its conclusion that the provisions in the CBAs at issue, which provisions grant lifetime health care benefits to retired police officers at no cost, are valid because the granting of such benefits is a proprietary function. In my opinion, the majority's exposition of governmental versus proprietary functions is unnecessary and irrelevant in the context of this case.

I first note that the trial justice did not address defendants' argument that "any contract made by a governmental authority involving the performance of a governmental function that extends beyond the unexpired terms of the governmental officials executing the contract is void because such an agreement improperly ties the hands of subsequent officials." (Quoting *Rhode Island Student Loan Authority v. NELS, Inc.*, 550 A.2d 624, 626 (R.I. 1988)). As this Court has previously stated, "we generally do not opine on legal issues that have not been explored and analyzed in the first instance by the trial court." *Felkner v. Rhode Island College*, 203 A.3d 433, 460 (R.I. 2019). In light of the fact that this case is being remanded to the Superior Court for further proceedings, I would suggest that the most prudent course of action would be to direct the trial justice to address the issue on remand.

Nevertheless, based upon the record before us, I believe that the elusive distinction between governmental and proprietary functions has no bearing on the resolution of this appeal. The CBAs at issue in this case are each for a term of three years, which term is specifically authorized by G.L. 1956 § 28-9.2-6. Each CBA, therefore, is valid and enforceable during its respective three-year period.

As the majority correctly notes, "a court must look to a retirement plan's provisions at the time an employee retires to ascertain whether he or she is entitled to a benefit." (Quoting *Arena v. City of Providence*, 919 A.2d 379, 395 (R.I. 2007)). Thus, a Woonsocket police officer who retired during the term of one of the CBAs at issue in this case obtained a vested contractual right to the health care benefits provided therein to retired police officers. The fact that the health care benefits will continue beyond the term of the CBA, and indeed beyond the terms of the officials who executed the agreement on behalf of the City, is of no moment. To hold otherwise would eliminate the possibility of a municipality from ever offering retirement benefits to its employees through collective bargaining.

In my judgment, the distinction between governmental and proprietary functions is simply irrelevant to the analysis in this appeal. The CBAs at issue were unquestionably valid, and the right to free lifetime health care benefits had vested for those police officers who retired during their existence. The defendants' argument in this regard creates a false dichotomy that should be rejected. It appears that the trial justice was not lured down this rabbit hole; neither should this Court.

My disagreement with the majority is only as to its reasoning supporting its conclusion that the postretirement health care benefits had vested. I agree with its ultimate holding, however, and with its opinion in all other respects.

**Justice Goldberg, concurring in part and dissenting in part.** I concur in the decision of the majority declaring that the Fiscal Stability Act provided the City with the requisite authority to adopt the Retiree Resolutions and its holding that vacates the judgment and remands this case to the trial justice for additional findings on whether the substantial impairment was reasonable and necessary to fulfill an important public purpose. However, I take issue with and

dissent from the majority's holding that the collective bargaining agreements and the numerous arbitration awards before us in this case represent, in any way, a proprietary function of the City of Woonsocket. Collective bargaining agreements between municipal governments and police unions epitomize a quintessential government function—employment of the police for the common good. Indeed, I would suggest that the provision of law enforcement services was one of the first governmental functions provided by a civilized society. Police and fire protection are the *sine qua non* of governmental functions.

**Postretirement Health Care Benefits**

However, although I am convinced that the majority erred in characterizing police collective bargaining agreements as "proprietary in nature" and that this conclusion is both unfortunate as well as wrong, I am also convinced that this Court should have summarily rejected defendants' contentions that all of the collective bargaining agreements entered into between the City and the police union were void. These arguments have no bearing on the issues in this case. It is therefore understandable that the trial justice failed to address defendants' contentions that the contracts in this case were void because the provision for postretirement health care benefits extended beyond the terms of office of the various municipal officials who voted to ratify them. Therefore, there are no findings or legal conclusions for this Court to pass upon, which, of course, is what we do. Furthermore, plaintiffs failed to address this issue before both the trial court and this Court. Thus, we are operating in a vacuum. For the reasons set forth herein, this Court should summarily reject defendants' contentions as irrelevant, rather than proceed to make new law. In the alternative, because we are remanding this case to the Superior Court, we should direct the trial justice to decide this issue in the first instance.

Additionally, and determinatively in my opinion, by their very nature, postretirement benefits—whether pensions, cost of living adjustment (COLA) benefits, or health care for retirees—only become operative after the employee retires. It is oxymoronic to suggest that a contractual benefit that does not vest until one has worked the full contractual period—at least twenty years in the case of a police officer—is void because, as defendants have argued, some "contractual promise" somehow extends "beyond the term of the collective bargaining agreement in which it was made." Were this the case, all collective bargaining agreements that include postretirement benefits would be subject to challenge.

Unfortunately, the majority has elected to address these issues, and, in a marked departure from our settled law, the majority has reached an incorrect conclusion. In doing so, the majority, and defendants, overlook the nature of the continuing contractual relationship between the parties, especially the fact that this so-called "contractual promise" that defendants challenge but fail to identify was renewed in every collective bargaining agreement and the seven arbitration awards before us. Indeed, the 2002-2005 CBA specifically provides for the continuation of the agreement until the next agreement is reached:

**"SECTION XXIII: DURATION OF THE AGREEMENT**

"This Agreement shall be for a term of three (3) years beginning July 1, 2002 and shall expire on June 30, 2005. This Agreement shall remain in force after its expiration date if negotiations between the City of Woonsocket and the IBPO Local 404 have not resulted in a new agreement, until such time as a new agreement has been reached."

Thus, we are not confronted with a contract that imposed restrictions on the City by a body no longer holding office. The so-called "contractual promise" of postretirement health care benefits has been renewed since its inception and does not become operative until the officer

retires from service, and the provision in the CBA in effect at the time is the controlling provision.

Furthermore, in reaching this decision, the majority overlooks the fact that we also are confronted with numerous arbitration awards. Indeed, several years elapsed between the 2002-2005 CBA and the 2010-2012 CBA. The record reveals that there were seven interest arbitration awards in place of CBAs until the 2010-2012 CBA was ratified. Interest arbitration awards are not subject to a proprietary/governmental analysis. By statute, interest arbitration awards extend into the next CBA. *See* G.L. 1956 § 28-9.2-17. It is therefore unnecessary for this Court to venture into these waters. Nonetheless, the majority's conclusions are erroneous.

**Governmental and Proprietary Functions**

The majority decision erroneously concludes that the CBAs were "executed in furtherance of a proprietary function" *by the City*, rather than examining the nature of the work the contracting party has been hired to perform, thereby fulfilling the municipality's governmental responsibility. This Court's unwavering focus in these cases is on the work the governmental entity is seeking to accomplish when it enters into the contract. That is the law in this state. The majority has erroneously interpreted this Court's holdings in *Parent v. Woonsocket Housing Authority*, 87 R.I. 444, 143 A.2d 146 (1958), and *Rhode Island Student Loan Authority v. NELS, Inc.*, 550 A.2d 624 (R.I. 1988). In *Parent*, we recognized that the Woonsocket Housing Authority was empowered to perform both proprietary and governmental functions. *Parent*, 87 R.I. at 448, 143 A.2d at 148. The focus in *Parent* was on the duties that the plaintiff, Parent, was contracted to perform for the housing authority, not on any particular aspect of the employment contract, such as salary or benefits. *Id.* at 448, 143 A.2d at 147. This Court looked to the housing authority's enabling act to determine its authority and found that the

- 39 -

housing authority was "charged with the performance of many duties which are clearly governmental in character. For example, it has the power to make investigations and is vested with the power of eminent domain." *Id.* at 448, 143 A.2d at 148. We then concluded that Parent's appointment as legal counsel "relates to the governmental function of the housing authority." *Id.* The same is true here, where the appointment, classification, and promotion of police officers relates to the governmental function of policing.

Likewise, the issue in *NELS* was "whether *NELS's segment* of RISLA's operation [was] governmental or proprietary in nature." *NELS, Inc.*, 550 A.2d at 627 (emphasis added). The Court in *NELS* set forth "the distinction between a governmental and proprietary function" of the government agency. *Id.* "[I]n Rhode Island a proprietary function is one 'not so intertwined with governing that the government is obligated to perform it only by its own agents or employees.'" *Id.* (quoting *Lepore v. Rhode Island Public Transit Authority*, 524 A.2d 574, 575 (R.I. 1987)). Consistent with this well-settled law, this Court then looked to *NELS's duties* in relation to RISLA's operations, and not to the provisions of the contract. *Id.* We found that "the particular facet of RISLA's operations that NELS covers is clearly proprietary[,]" and likened it to a sophisticated collection agency for RISLA's student loans and recognized the fact that NELS could "neither exercise discretion nor set policy in the performance of its duties." *Id.* This Court concluded "that that portion of RISLA's operations serviced by NELS is 'not so intertwined with governing that the government is obligated to perform it only by its own agents or employees.'" *Id.* (quoting *Lepore*, 524 A.2d at 575).

The focus in these cases is always on the function the governmental entity is contracting to have performed, and not on some benefit or other provision set forth in the agreement. The Court does not look to whether a private employer may include a contractual provision in the

private employer's labor agreement. The function in the present case is police work—public safety for the protection of the citizenry. There is nothing proprietary about the delivery of police services. Law enforcement officers are sworn members of a paramilitary organization with arrest powers. Clearly, this is an activity "so intertwined with governing that the government is obligated to perform it only by its own agents or employees." *Lepore*, 524 A.2d at 575 (quoting *Xavier v. Cianci*, 479 A.2d 1179, 1182 (R.I. 1984)).

In shifting its analysis to the specific provisions of the CBAs in this case, the majority also misconceives our decision in *Roach v. State*, 157 A.3d 1042 (R.I. 2017), in which this Court declared that in our task of "deciphering when the state executes a proprietary versus a governmental function * * * this Court pinpoints the function at issue and examines whether it is so significantly tied to governing that private persons or entities could not possibly fulfill it." *Roach*, 157 A.3d at 1053. Importantly, there was no collective bargaining agreement or employment contract in *Roach*; the plaintiff was a per-diem nurse employed at the state owned and operated Veterans Home, a nursing facility for aged and infirm veterans. *Id.* at 1044. She was injured in a fall, and one of the issues before this Court concerned the public duty doctrine. *Id.* This Court rejected the state's attempt to confine our analysis to a discrete aspect of the governmental function, the maintenance of the facility, based on the state's argument that the Home was a creature of statute "with its management vested in the Director of Human Services." *Id.* at 1051, 1052. We viewed the activity more functionally, concluding that "the pertinent government function is resident-patient care." *Id.* at 1052. We upheld the trial justice's refusal to apply the public duty doctrine to the facts in *Roach*, concluding that "[t]he discrete function here—that is, care for nursing home resident-patients—is not the type shielded from tort

liability[,]" nor did the activity giving rise to the plaintiff's injuries occur during the performance of "a discretionary governmental function warranting immunity." *Id.* at 1051, 1052.

In a marked departure from our previous holdings, the majority cites *Roach* and declares, "[w]hen conducting our inquiry into the governmental or proprietary nature of a contract, our review is *limited to the contents of the contract or contracts* actually before us"; and it is from there that the Court "pinpoints the function at issue and examines whether it is so significantly tied to governing that private persons or entities could not possibly fulfill it." *Roach*, 157 A.3d at 1053. This is incorrect. The focus in this analysis, for purposes of the public duty doctrine or the length of employment contracts, is the activity that the governmental entity is charged with performing. In *Roach*, this Court observed:

> "Whether a function is so intermingled with governing, such that only government agents or employees can execute it, begs the question of whether nongovernmental employees or private persons can also perform the function. In both inquiries, this Court pinpoints the function at issue and examines whether it is so significantly tied to governing that private persons or entities could not possibly fulfill it." *Roach*, 157 A.3d at 1053.

I therefore conclude that the collective bargaining agreements in this case between the police union and the City of Woonsocket relate to the performance of a governmental function, and the decision of the majority to look to the provisions of the contract to determine whether those provisions can also be performed by a private entity is simply incorrect.

It is my opinion that this issue is wholly irrelevant to the issues before the Court and should have been summarily rejected. Consequently, I dissent.

**Justice Robinson, concurring.** After careful reflection, I have concluded that I am able to join in the Court's meticulous and laudably restrained opinion in this case. I add this separate

concurrence in order to briefly reiterate my strongly held reservations with respect to the presently prevailing jurisprudence relative to the constitutional prohibition against the impairment of contracts contained in the United States Constitution and also contained (in remarkably similar language) in the Rhode Island Constitution.[1] While I recognize that the United States Supreme Court's precedent in this regard tends to be very instructive with respect to the application of the Contracts Clause in the Rhode Island Constitution, which is at issue in the instant case, I simply wish to express my continuing and strongly held concern about the extent to which many courts throughout the nation increasingly countenance impairment of contractual relationships in the face of what I believe to be very clear constitutional language regarding the impairment of contracts. I do not in any way retreat from the points that I made about Contracts Clause jurisprudence in my recent concurring opinion in *Cranston Police Retirees Action Committee v. City of Cranston*, No. 2017-36-Appeal, 2019 WL 2332508, at *23-24 (R.I. June 3, 2019) (Robinson, J., concurring), nor do I retreat from my expressed agreement therein with the authorities cited.

---

[1] I note that it is the Rhode Island Constitution and not the United States Constitution that is at issue on appeal in the instant case.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Glen Hebert et al. v. The City of Woonsocket, by and through its Mayor, Lisa Baldelli-Hunt, et al. |
| **Case Number** | No. 2016-77-Appeal.<br>No. 2016-78-Appeal.<br>(PC 13-3287) |
| **Date Opinion Filed** | July 2, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Jeffrey A. Lanphear |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Edward C. Roy, Jr., Esq.<br>For Defendants:<br><br>Sara A. Rapport, Esq.<br>Michael J. Marcello, Esq.<br>Matthew H. Parker, Esq.<br>Timothy K. Baldwin, Esq.<br>John DeSimone, Esq. |